# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**BRUCE M. PENNAMPED**
**NANCY L. CROSS**
Cross Pennamped Woolsey & Glazier, P.C.
Carmel, Indiana

ATTORNEYS FOR APPELLEE:

**ANDREW C. MALLOR**
**KENDRA G. GJERDINGEN**
Mallor Grodner, LLP
Bloomington, Indiana

FILED

Aug 26 2014, 9:43 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JEFFREY CRIDER, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | No. 53A05-1307-DR-358 and |
| | ) | 53A04-1401-DR-26 |
| CHRISTINA CRIDER, | ) | |
| | ) | |
| Appellee. | ) | |

APPEAL FROM THE MONROE CIRCUIT COURT
The Honorable Frank M. Nardi, Special Judge
Cause No. 53C06-0905-DR-331

**August 26, 2014**

**OPINION - FOR PUBLICATION**

**BARNES, Judge**

**Case Summary**

Jeff Crider appeals various parts of the trial court's decree dissolving his marriage to Christina Crider, as well as several post-judgment orders. Several business entities in which Jeff has an interest also have intervened in this case. We affirm in part, reverse in part, and remand.

**Issues**

The restated issues before us are:

I. whether the trial court properly ordered Jeff to pay any attorney fees Christina might incur in enforcing a monetary judgment;

II. whether the trial court properly ordered Jeff to make a cash equalization payment to Christina of $4,752,066 plus 8% statutory post-judgment interest;

III. whether the trial court properly valued a closely-held business in which Jeff held stock;

IV. whether the trial court properly valued two other businesses in which Jeff held membership interests;

V. whether the trial court properly excluded from the marital estate purported loans Jeff's father made to him;

VI. whether the trial court properly delayed, for ninety days from the date of the dissolution decree, implementation of a reduction in Jeff's child support obligation from his provisional support obligation, and then subsequently modified the decree to entirely reverse that reduction;

VII. whether the trial court properly granted Christina a security interest in Jeff's stock and membership interests in several closely-held family businesses and ordered that one-half of those stock and membership interests be transferred to Christina if Jeff failed to pay the cash equalization payment within 180 days of the dissolution decree;

2

VIII. whether the trial court granted a continuing lien against future property Jeff may acquire in order to satisfy the equalization judgment;

IX. whether the trial court properly ordered attachment of future loan proceeds Jeff may receive in order to satisfy the equalization judgment; and

X. whether the trial court properly entered garnishment, attachment, and child support income withholding orders against Jeff.

**Facts**

Jeff and Christina were married in 1992. They had two children during their marriage, one of whom is now emancipated. Christina first filed for divorce in 2006 and filed for legal separation in 2007, but both actions were dismissed. In May 2009, Christina filed another divorce petition.

Jeff is involved in a large number of business entities with his father, Robert, and his brother, Steve. The primary family business is Crider & Crider, Inc. ("CCI"), which is engaged in road and other construction work primarily in the Bloomington area. Jeff, Robert, and Steve are the only shareholders of this closely-held S corporation. Jeff owns approximately 42.25% of the stock, Steve 42.25%, and Robert the remaining 15.5%. Two of the other family businesses are Logan Land Development, LLC, ("Logan") and North Park, LLC. Both entities own property in a planned unit development ("PUD") site in Bloomington called North Park. Jeff's interest in these entities is 33%. Other business entities at issue here, along with Jeff's interest therein, are: J.E. Crider & Son, LLC (30%), Crider Holding Company, LLC (33%), Crider Family Limited Partnership 1 (24%), Lancor, LLC (50%), North Eastern Holdings, LLC (33%), and South Central Holdings

3

Corp. (33%). Jeff also owned a fifty percent interest in Jefferson Centre, LLC, but it had no value at the time of dissolution. We will refer to the Crider businesses together as the "Crider Entities." None of the Crider Entities were joined in the dissolution action; after a final dissolution decree was entered, they were granted permission to intervene in the case.

In 1993, Robert, Jeff, and Steve signed a stock transfer restriction agreement with respect to their holdings in CCI. The agreement prohibited any shareholder from encumbering any of their shares without prior written consent from the other shareholders, unless certain narrow exceptions were met. Additionally, the agreement purported to prohibit any transfer of shares to any other person unless first CCI, and then the other shareholders, were given the option to purchase the shares. It also required that any outside purchaser of CCI stock agree in writing to be bound by the agreement. It further stated, "No Shareholder shall sell, give away or otherwise dispose of any of his Shares (whether voluntarily or involuntarily, by operation of law or otherwise)" to any person in violation of the agreement, and that any such transfer of stock would be "void ab initio and of no force or effect whatsoever." Intervenors's App. p. 160.

The LLCs also had restrictions on the transfer of membership interests written into their operating agreements.[1] The operating agreement for Lancor provided in part:

> If any Membership Interest becomes subject to any Involuntary Transfer, the remaining Members shall have the option for a period of thirty (30) days to purchase such Membership Interest. The purchase price and terms of purchase shall be the purchase price and terms as if the Member died on the occurrence of the Involuntary Transfer. If the remaining

---

[1] The operating agreements for Crider Holding Company and South Central Holdings Corp. are not in the record.

4

> Members do not purchase the Membership Interest of the Member subject to the Involuntary Transfer, the Members shall proceed with reasonable promptness to liquidate the business of the Company. The procedure as to liquidation and distribution of assets shall be governed by this Agreement with reference to termination in the event of a Member's death.

Id. at 172. The operating agreements for North Eastern Holdings and North Park contain identical provisions regarding involuntary transfer of membership interests. The operating agreement for Jefferson Centre contains identical language regarding the right of the other members to purchase a membership interest subject to an involuntary transfer, but is silent with respect to what should happen if the remaining members decline to exercise that right. Finally, there is different language in the operating agreements for J.E. Crider & Sons and Logan governing involuntary transfers. Those agreements provide that if one member's interest is transferred without the consent of the other members,

> the transferee shall have no right to participate in the management of the business and affairs of the Company or to become a Member, and such transferee shall only be entitled to receive the share of profits or other compensation by way of income and the return of contributions to which the transferor of such Interest in the Company would otherwise be entitled.

Id. at 205.

During the first ten years of the marriage, Christina primarily was a "stay-at-home" parent taking care of the children, at Jeff's request. In 2002, she started an interior design business, but it was not profitable and she closed the business in 2012, when it had a remaining inventory of $52,000. Christina also had some part-time employment during the marriage.

5

Jeff's finances are complicated. There can be no doubt, however, that he earns considerably more per year than the $72,000 in salary that he received from CCI and that Jeff often characterizes as his only income. There was evidence presented that through 2007, CCI regularly made sizeable annual distributions to its shareholders, Jeff, Steve, and Robert. After that time, Jeff (and Steve and Robert) began loaning money to CCI instead, despite the fact that gross profits for the company were largely unchanged. For example, according to CCI's balance sheets, in 2007, it distributed $6,298,614 to the shareholders on gross profits of $8,131,994. In 2009, the year Christina filed for divorce, CCI paid no distributions to its shareholders, the shareholders instead loaned $3,784,829 to CCI, and its gross profits were $8,920,606. Steve later stated that companies who bonded CCI on its construction projects required the shareholder loans in order to provide greater equity in the company, but in fact the bonding companies indicated that this was not necessary and that CCI was a very financially sound company.

After 2007, Jeff was reluctant to provide personal financial statements to banks who loaned money to CCI based in part on Jeff's personal guarantee. The last time Jeff provided a personal financial statement was in 2007, before Christina filed for divorce, and it estimated his personal net worth at more than $11,000,000. Jeff's income tax returns are not helpful in determining his actual income. For example, his 2010 return reflects an adjusted gross income of $931,199 and a tax refund of $138,686. His 2011 tax return reflects an adjusted gross income of -$430,424, but still a tax refund of $128,594. An accountant for CCI indicated that the income figures on the tax returns are largely meaningless, because individual shareholders of an S corporation, like Jeff, must report on

6

their returns income that passes to them from the corporation, even if the corporation does not actually make any distributions to the shareholders. The accountant also testified that CCI would pay "bonuses" to the shareholders to compensate them for any tax liability caused by the pass-through income, even if it did not make shareholder distributions.

Further uncertainty about what Jeff's income is comes from the June 2012 "Agreed Entry Modifying Child Support Obligation" upon emancipation of the couple's oldest child. That agreement listed Jeff's weekly income as $17,737, or $922,324 per year, with a resulting weekly support obligation of $1,257.13 for the one remaining child. The Criders' lifestyle also reflected a high level of income. The marital home sold for nearly $1.5 million during the pendency of the divorce, the couple owned a condominium in Hilton Head, South Carolina, they had floor tickets to Indiana University basketball games, and they took private flights for vacations. Also, after the parties separated in 2009, Jeff withdrew $40,000 from an account of Crider Holding Company and deposited it into an account of a woman he was dating.

Robert also "loaned" Jeff large sums of money on several occasions. In 2001, Robert purportedly loaned $415,000 so Jeff could purchase additional shares of CCI stock from Robert; the promissory note for this loan had a due date of December 31, 2006. In October 2007, Robert purportedly loaned Jeff an additional sum of $608,040.27; the promissory note for this loan had a due date of October 30, 2009. In December 2007, Robert purportedly loaned Jeff an additional sum of $1,026,614.79; the promissory note for this loan had a due date of December 31, 2012. Jeff never made any payments toward any of these loans, which, according to Jeff, "were an estate planning device to transfer

7

ownership of the Crider Entities at [Robert's] death at a pre-determined price" and to reduce the size of Robert's estate. Appellant's Br. p. 39.

In addition to these purported loans, in 2005 Jeff sold his interest in another company, HIS Constructors, to Robert in exchange for a promissory note in the amount of $530,000. Robert has paid $50,000 toward this note, which Jeff expects his father to eventually pay in full. Robert, in fact, later sold his interest in HIS Constructors for $1.2 million. Also, in October 2007, Jeff "loaned" $2,107,412 to CCI. In October 2008, this note was rewritten to reflect an outstanding debt of $1,649,994.48, although CCI had not, and never has, made any payments on the loan. There also was evidence that at the end of 2009, Jeff was entitled to receive a bonus from CCI of over $175,000, but that he instead characterized this bonus as a loan from CCI.

The trial court conducted a dissolution hearing over the course of eleven days and received extensive evidence and testimony from both parties. In part, there was widely divergent testimony from various experts regarding the proper valuation of CCI and Jeff's interest in it. Part of the discrepancy was related to whether CCI's value should be reduced to account for purportedly unfunded union pension liabilities; Christina presented evidence that there should be no such reduction, while Jeff presented evidence that there should be a reduction in an amount of over $4.5 million. The parties also presented varying evidence regarding the value of the heavy machinery and equipment that CCI owned. Christina's accounting expert utilized an appraisal that valued the machinery and equipment at $20.1 million, using a "desk top" methodology that valued all the machinery and equipment CCI owned in 2009. Jeff's accounting expert, by contrast, utilized different appraisals, based

8

on sales of comparable equipment and machinery at auction, with a resulting value range between $9,599,575 and $10.2 million. However, these appraisals excluded equipment that CCI had owned in 2009 that it later disposed of before the appraisals took place. Ultimately, Christina's expert placed a total value on CCI of $15.6 million, with the value of Jeff's interest being $4,321,000.

There was also conflicting testimony and evidence regarding the valuation of North Park and Logan. Both entities owned land in North Park PUD totaling over 291 acres. Experts for Christina and Jeff presented wildly varying estimates of the value of the land owned by North Park and Logan combined. Christina's expert, in particular, opined that the value of the 291-acre North Park PUD property in 2009—which was only partially developed at the time—was approximately $9,650,000, over $33,000 per acre. This valuation was based in part on the sale in 2006 of eighty-four acres within the North Park PUD to Bloomington Hospital at a cost of $150,000 per acre. Christina's expert also considered the pre-discount value of the property to be $24,343,000, with the discount taking into account the cost of developing the land. By contrast, Jeff's expert opined that the prospect of further developing the North Park PUD land was especially dim in 2009, and further believed it would be very costly to develop the land in accordance with the PUD's requirements. He placed a total value on the 291 acres of $1,820,000, or approximately $6,000 per acre.

Christina's and Jeff's experts also differed as to the proper valuation of certain bonds held by North Park in 2009. Although sometimes described by the parties as tax increment financing ("TIF") bonds, they were not in fact TIF bonds in 2009. Instead, they

9

were bond anticipation notes ("BANs") issued by Monroe County in anticipation of the issuance of $7 million in TIF bonds in 2010, which in fact were issued by Monroe County. In 2009, the BANs were listed on North Park's balance sheet as an asset with a book value of $5,759,522. The BANs were issued to assist Monroe County with start-up development costs of the North Park PUD. The TIF bonds that replaced the BANs were supposed to be repaid through increased property tax revenues from the North Park PUD as the land was developed and the value of the land rose. In his valuation of North Park, Christina's expert included the 2009 book value of the BANs, as listed in North Park's financials that year. Jeff's expert, by contrast, asserted that the TIF bonds that replaced that BANs were worth much less than the book value of the BANs, because development in North Park was slow in occurring and it was unlikely that sufficient property tax revenue would arise in order to fully repay the TIF bonds and, essentially, they would be defaulted. In accordance with this analysis, Jeff's expert valued the BANs in 2009 at $1,150,000.

On June 26, 2013, the trial court entered a final dissolution decree, accompanied by extensive findings of fact and conclusions thereon. With respect to the valuation of CCI, the trial court largely accepted the methodology and conclusions of Christina's expert, except with respect to the valuation of the company's heavy equipment and machinery. It rejected the "desk top" appraisal used by Christina's expert and found it was more appropriate to value the equipment and machinery using auction value, as Jeff's experts had done. However, the trial court also noted that Jeff's experts failed to appraise all the equipment and machinery CCI owned in 2009, which it had chosen as the marital estate's proper valuation date. The trial court assigned a value of $11 million to the equipment and

10

machinery. Also, with respect to the valuation of CCI, the trial court found that it should not be reduced by over $4.5 million for an unfunded pension liability, as Jeff's expert claimed it should have been. The trial court found CCI to have a total value of $10,150,746, and Jeff's 42.5% interest in the company to be worth $2,810,506, after discounts for non-marketability and the fact that many of Jeff's shares were non-voting.

With respect to the value of the real estate in the North Park PUD, the trial court accepted the valuation placed on it by Christina's expert. This resulted in Jeff's 33% interest in North Park being valued at $1,614,000 and his 33% interest in Logan being valued at $2,853,000. Also, regarding North Park, the trial court noted that it was listing the BANs as an asset worth $5,759,522 on its 2009 financial statements, and that North Park did in fact receive TIF bonds worth more than that amount in exchange for the BANs in 2010. The trial court also rejected as too speculative the contention of Jeff's expert that no development would take place in North Park through 2021, when the TIF bonds were due. Thus, the trial court included the $5,759,522 in its calculation of North Park's total value.

The trial court also excluded the purported loans from Robert to Jeff as marital liabilities. It did include the note payable by Robert to Jeff as a marital asset, as Jeff agreed it should be. The trial court also excluded the $1,649,994.48 loan from Jeff to CCI as a marital asset.

Ultimately, the trial court found that the total value of Jeff's business and real estate interests in 2009 was over $11 million, which was offset by little marital debt. The trial court evenly split the marital estate, which resulted in Christina and Jeff each being entitled

11

to $5,510,930 in assets. However, because Christina received few liquid assets, the trial court required Jeff to make an equalization payment to Christina of $4,752,066. It also reduced that required payment to a judgment and ordered that it bear statutory interest, unless Jeff paid it in full within ninety days.

In order to secure payment of the judgment, the trial court ordered as follows:

> Christy shall be given a security lien on all of Jeff's shares and ownership interests in Crider & Crider and the Crider Entities (and of any successor to or affiliate thereof). Jeff shall pledge his shares and ownership interests in these businesses to secure Christy's judgment.

> \* \* \* \* \*

> If within 180 days of this Court's Final Decree Jeff has not paid the Judgment in full, Christy shall take ownership and control of one half of Jeff's shares in Crider & Crider and the Crider Entities. Christy shall retain ownership and control of these shares in these entities until such time as the Judgment has been paid in full with all accrued interest. Jeff shall be responsible for any attorney's fees incurred by Christy in the course of collecting this Judgment or in executing her security interest in Jeff's shares of Crider & Crider and the Crider Entities.

App. pp. 63-64.

Regarding child support, the trial court modified Jeff's weekly support obligation to $308, but delayed the effectiveness of this change for ninety days. The trial court modified Jeff's support obligation because it recognized that his high income was coming from his business assets, but that his income would be reduced because Christina would be receiving fifty percent of those assets. The trial court found that Jeff's income would be

12

approximately $200,000 annually, or $3,846 per week, following the division of the marital estate.

Jeff did not pay the equalization judgment to Christina within either ninety or 180 days. Instead, he filed a notice of appeal on July 25, 2013. It does not appear Jeff sought a stay of the judgment pending appeal. On July 29, 2013, the trial court clerk filed its notice of completion of the clerk's record. The trial court granted the Crider Entities permission to intervene on August 12, 2013, as Christina began her proceedings supplemental efforts to collect the equalization judgment.

On August 30, 2013, Christina also sought to modify the dissolution decree to the extent it reduced Jeff's child support obligation ninety days after it was entered. Specifically, she argued that because Jeff had refused to pay the equalization judgment, he was not entitled to the reduction in child support. Jeff had, in fact, started paying only $308 per week in child support after ninety days. Christina also sought a writ of attachment and a garnishment order for payment of the equalization judgment. On December 23, 2013, the trial court entered an order modifying the dissolution decree and requiring Jeff to continue paying child support at the rate of $1,257 per week.

On January 2, 2014, Christina filed a Verified Petition to Enforce Judgment. The contents of this petition have not been provided to this court. We do observe that the 180-time limit for Jeff to pay the equalization judgment before Christina would obtain "ownership and control" of one-half of Jeff's interests in the Crider Entities passed on December 28, 2013.

13

On January 10, 2014, the trial court entered both a garnishment order and a writ of attachment. The garnishment order stated in part:

> IT IS THEREFORE ORDERED that each of the Crider Entities withhold and forward wages, salary, commissions, etc. earned by Respondent, Jeffrey J. Crider until the judgment is satisfied. The amount to be withheld shall be the lesser of twenty-five percent (25%) of Respondent's disposable earnings or the amount by which his disposable earnings for the week exceed thirty (30) times the federal hourly minimum wage prescribed by 29 U.S.C. 206(a)(1), less the amount first withheld pursuant to any child support withholding orders.

Appeal 2 App. p. 85. The writ of attachment stated in part:

> IT IS THEREFORE ORDERED that each of the Crider Entities withhold and forward any and all amounts that would have otherwise been paid, loaned, distributed to, or otherwise due to Jeffrey J. Crider until the judgment is satisfied.

Id. at 87. On February 7, 2014, the trial court entered, at Jeffrey's request, a child support income withholding order, requiring monthly withholding from Jeffrey's CCI salary of $5,447 to pay the support obligation of $1,257 per week.

On January 27, 2014, Jeff filed a second notice of appeal, challenging the trial court's post-judgment rulings with respect to modifying child support and the garnishment and attachment orders. Jeff filed a motion to consolidate this second appeal with the first appeal. This court's motions panel denied that motion, but we will issue this single opinion addressing all issues raised in both appeals.

## Analysis

In issuing its dissolution decree, the trial court entered findings of fact and conclusions thereon at Jeff's request. When a trial court has made findings of fact and

14

conclusions thereon pursuant to Indiana Trial Rule 52, we apply the following two-tier standard of review: whether the evidence supports the findings of fact, and whether the findings of fact support the conclusions thereon. Campbell v. Campbell, 993 N.E.2d 205, 209 (Ind. Ct. App. 2013), trans. denied. We will set aside findings of fact only if they are clearly erroneous, which occurs if the record contains no facts to support a finding either directly or by inference. Id. We must defer to the trial court's ability to assess the credibility of witnesses and will not reweigh the evidence, and we must consider only the evidence most favorable to the judgment along with all reasonable inferences drawn in favor of the judgment. Stone v. Stone, 991 N.E.2d 992, 999 (Ind. Ct. App. 2013), aff'd on r'hg, 4 N.E.3d 666 (Ind. Ct. App. 2013). "It is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by appellant before there is a basis for reversal." Campbell, 993 N.E.2d at 209. A judgment also is clearly erroneous if it relies on an incorrect legal standard, and we do not defer to a trial court's legal conclusions. Stone, 991 N.E.2d at 998-99.

### I. Attorney Fees

The first issue we address is whether the trial court erred in ordering Jeff to pay any attorney fees Christina might incur in attempting to collect the equalization judgment. Indiana Code Section 31-15-10-1(a) provides that a trial court in a dissolution proceeding "periodically may order a party to pay a reasonable amount . . . for attorney's fees . . ., including amounts for legal services provided and costs incurred before the commencement of the proceedings or after entry of judgment." "We review a trial court's decision on attorney fees in connection with a dissolution decree for an abuse of discretion." Troyer

15

v. Troyer, 987 N.E.2d 1130, 1142 (Ind. Ct. App. 2013). When deciding whether to award attorney fees to a party in a divorce, trial courts must consider the relative resources of the parties, their economic condition, the ability of the parties to engage in gainful employment and earn adequate income, and other factors that bear on the reasonableness of the award. Id. at 1142-43. The legislative purpose behind Indiana Code Section 31-15-10-1 is to ensure that a party in a dissolution proceeding is able to retain representation when he or she would otherwise be unable to afford an attorney. Id. at 1143. "'When one party is in a superior position to pay fees over the other party, an award of attorney fees is proper.'" Id. (quoting Ratliff v. Ratliff, 804 N.E.2d 237, 249 (Ind. Ct. App. 2004)).

Jeff argues that it was erroneous for the trial court to enter a prospective award for attorney fees and that it could not award such fees without an evidentiary hearing at a future date to determine their reasonableness, citing Barnett v. Barnett, 447 N.E.2d 1172, 1176 (Ind. Ct. App. 1983).[2] This court, however, has held that trial courts enjoy "broad discretion in awarding attorney fees, including prospective awards . . . ." MacIntosh v. MacIntosh, 749 N.E.2d 626, 632 (Ind. Ct. App. 2001) (emphasis added), trans. denied. We also have held, "the statutory authority for the allowance of attorney fees in a dissolution of marriage proceeding permits these awards to be made pendente lite or 'pending the action.'" Svetich v. Svetich, 425 N.E.2d 191, 195 (Ind. Ct. App. 1981). Additionally, "the trial court has the power to make the allowance and order payment [of attorney fees] either

---

[2] Jeff also cites Leibowitz v. Moore, 436 N.E.2d 899 (Ind. Ct. App. 1982). That case was not a dissolution and we do not believe it has relevance with respect to the distinct statutory basis for granting attorney fees in a dissolution.

16

before or after the expenses are incurred." Id. (citing Davis v. Davis, 141 Ind. 367, 40 N.E. 803 (1895)). "The power to award expenses prospectively is consistent with the purpose of allowing suit money pendente lite." Id.

This case is slightly different than Svetich, in that the trial court here did not actually make a pendente lite or "retainer" award of attorney fees in a set dollar amount. However, it did not do so because it was unclear at the time of the dissolution decree whether Jeff would resist paying the equalization judgment and, thus, whether Christina would have to incur attorney fees to enforce it. Furthermore, the trial court's findings as a whole clearly indicate that, until that judgment is paid, Christina is in an extremely disadvantageous economic position as compared to Jeff, and there is ample evidence to support such findings. And, the prospective award of attorney fees only extends to such time as Christina collects the judgment and is made roughly economically equal with Jeff; it does not continue indefinitely. We cannot say the trial court abused its discretion in prospectively ordering Jeff to pay any attorney fees Christina might incur in her efforts to collect the judgment. We will say, however, that the precise amount of such fees must be reasonable, must be supported by evidence from Christina as to such reasonableness, and is subject to challenge by Jeff as to their reasonableness. In other words, Christina (and her attorneys) are not entitled to a "blank check" with respect to attorney fees. But the decision to prospectively hold Jeff liable for Christina's reasonable attorney fees incurred in enforcing the equalization judgment was proper.

## II. Post-Judgment Interest

17

Next, Jeff contends the trial court erred in ordering that the equalization judgment bear post-judgment interest if it was not paid within ninety days. Indiana Code Section 24-4.6-1-101 provides, in the absence of a contract between the parties, that "interest on judgments for money whenever rendered shall be from the date of the return of the verdict or finding of the court until satisfaction at . . . an annual rate of eight percent (8%) . . . ." The purpose of this statute is to provide an incentive for judgment debtors "to satisfy expeditiously their debt obligations to avoid this accrual of interest." Poehlman v. Feferman, 717 N.E.2d 578, 583 (Ind. 1999). "[T]hose finding themselves on the wrong side of the law after trial must decide whether to limit their liability and pay up or risk incurring further liability in the form of accruing interest if not successful on appeal." Id.

However, this statute does not mandate the imposition of post-judgment interest in dissolution cases where the trial court has awarded a monetary judgment to one of the parties. Rovai v. Rovai, 912 N.E.2d 374, 376 (Ind. 2009). Rather, whether to award post-judgment interest falls within a trial court's discretion "in the course of fashioning a just and reasonable division of property." Id. The Rovai court noted that in "the equitable world of dissolutions . . . some court orders look a good deal like civil judgments and others bear no resemblance." Id. "In a straight civil judgment, post-judgment interest and the time value of money bear such a straightforward relationship that courts are led to deploy adages like 'interest goes with the principal as the fruit with the tree.'" Id. (quoting Reese v. Reese, 696 N.E.2d 460, 463 (Ind. Ct. App. 1998)). Dissolution decrees, by contrast, "represent a more complex allocation of economic values" and "the time value of money

18

acquires a much more nuanced meaning than it does when a court hears a credit card collection case and says, 'Judgment for $5,800.'" Id.

Rovai clearly does not prohibit an award of post-judgment interest in dissolution cases but leaves such decisions within a trial court's discretion. We review decisions falling with a trial court's discretion for an abuse of that discretion. Tapia v. State, 753 N.E.2d 581, 584 (Ind. 2001). A trial court abuses its discretion only when a decision is clearly against the logic and effect of the facts and circumstances before the court, or when it has misinterpreted the law. Grimes v. Crockrom, 947 N.E.2d 452, 454 (Ind. Ct. App. 2011).

Jeff argues in part that it was excessive to award statutory post-judgment interest because it amounts to approximately $1,041 per day, which exceeds the income the trial court imputed to him post-dissolution ($200,000 annually) by over $500 every day. This argument is misleading, because the imputed income of $200,000 annually was based upon Jeff's payment of the equalization judgment through liquidation of some of his assets. Those same assets and business interests have been generating annual income to Jeff of up to $900,000 or more and have given him a personal net worth of approximately $11 million. Until Jeff in fact pays that judgment, at which time the accrual of post-judgment interest will end, that accrual of interest is not unreasonable in relation to Jeff's income and net worth.

Jeff also contends, essentially, that it is unfair to award post-judgment interest because it is difficult or impossible for him to pay the sizable equalization judgment, because he was awarded very few liquid assets in the dissolution decree, as opposed to his

19

interests in the various Crider Entities. He, moreover, seems to claim he cannot liquidate those interests because he does not possess a controlling interest in any of the various Crider Entities that made up the vast majority of his net worth. The question, however, is not whether Jeff has a controlling interest in any of the Crider Entities, but whether he controls his own interests in them. He clearly does so. Simply put, Jeff might have to drastically alter the nature and scope of his business interests in order to pay the judgment. He may have to encumber, sell off, or liquidate some of those interests. If he truly, absolutely is unable to do so, then Christina is entitled to receive the benefits of those interests until she receives her fair share of the marital estate.

Although the judgment here is undeniably large, Jeff makes no argument that the value of his interests in the Crider Entities should not have been included in the marital estate[3] or that the trial court should have deviated from a 50/50 division of the marital estate. Jeff is not entitled to stand idly by and continue his own personal status quo while Christina does not receive the judgment to which she is entitled. To the contrary, we cannot say it was improper to use the tool of statutory post-judgment interest as an incentive to encourage Jeff to take the necessary steps to pay that judgment, after the expiration of a ninety-day grace period. We also believe that the judgment looks "a good deal" like a typical civil judgment, for which an award of post-judgment interest is appropriate in order to compensate Christina for the time value of money. See Rovai, 912 N.E.2d at 376. The trial court did not abuse its discretion in making that award.

---

[3] Jeff does, of course, make some arguments about the trial court's valuation of the Crider Entities, which we discuss below.

20

### III.  Valuation of CCI

We now turn our attention to the trial court's valuation of CCI.  "We review a trial court's decision in ascertaining the value of property in a dissolution action for an abuse of discretion."  Balicki v. Balicki, 837 N.E.2d 532, 536 (Ind. Ct. App. 2005), trans. denied.  Generally, there is no abuse of discretion if a trial court's chosen valuation is within the range of values supported by the evidence.  Id.  "'A valuation submitted by one of the parties is competent evidence of the value of property in a dissolution action and may alone support the trial court's determination in that regard.'"  Alexander v. Alexander, 927 N.E.2d 926, 935 (Ind. Ct. App. 2010) (quoting Houchens v. Boschert, 758 N.E.2d 585, 590 (Ind. Ct. App. 2001), trans. denied), trans. denied.  In reviewing a trial court's valuation of property in a dissolution, we will neither reweigh the evidence nor judge the credibility of witnesses.  Bass v. Bass, 779 N.E.2d 582, 590 (Ind. Ct. App. 2002), trans. denied.

### A.  Pension Obligations

Jeff's first attack on the trial court's valuation of CCI is that it allegedly failed to account for an unfunded pension liability of over $4.5 million.  In his valuation of CCI, Jeff's expert, Steven Riddle, deducted that amount from the value of CCI's assets, based on information provided by a construction industry group representative that this amount reflected "estimated unrecorded economic liability associated with [CCI's] portion of the unfunded pension plans . . . ."  Ex. SSS1, p. 55.  Riddle's report further stated that this amount:

> while not recorded for GAAP, is an estimate of the potential
> cost to fully fund this liability if the Company became a non-
> union Company or if the Company liquidated and ceased to

21

operate. The Company is legally obligated to fund this deficiency if either of these two events occur. If the Company continues to operate, the liability will likely be funded through much higher contributions to the union pension plans as union employees retire and begin to draw benefits against these plans. As a result, this liability is real and will come out of the Company's future cash flows, one way or another.

Id.

Some explanation is in order regarding so-called "unfunded" pension liabilities. The first half of the above quoted paragraph is referring to the federal Multiemployer Pension Plan Amendment Act ("MPPAA") and pension withdrawal liabilities thereunder. This law "was enacted by Congress to protect the viability of defined pension benefit plans, to create a disincentive for employers to withdraw from multiemployer plans, and also to provide a means of recouping a fund's unfunded liabilities." Sun Capital Partners III, LP v. New England Teamsters & Trucking Industry Pension Fund, 724 F.3d 129, 138 (1st Cir. 2013), cert. denied. "[T]he MPPAA requires employers withdrawing from a multiemployer plan to pay their proportionate share of the pension fund's vested but unfunded benefits." Id. The second half of the above quoted paragraph appears to be referring to the general problem of pension plans being underfunded in an actuarial sense and an employer having to account for such underfunding in the future when retirees are withdrawing more from a pension plan than the plan can bear.

An expert for Christina, Thomas Sponsel, discussed "unfunded" pension liability being "a major issue" in the context of well-publicized matters such as the General Motors bankruptcy and public employee pension fund shortfalls. Tr. p. 156. However, he also stated that such concerns did not impact his valuation of CCI. He observed that the audited

22

financial statements prepared by CCI's accountants in 2009 noted <u>funded</u> pension liabilities of the company but made no mention of any <u>unfunded</u> liabilities. Sponsel also stated that he has performed valuations of other construction companies and the issue of MPPAA pension withdrawal liabilities "has never been even brought up as a single issue." <u>Id.</u> As for whether CCI might actually be subject to an MPPAA pension withdrawal liability, Sponsel noted that there is no indication that CCI has any plans to switch from union to non-union labor, or that it would cease operations at any time in the foreseeable future. Thus, the two conditions for triggering MPPAA liability were unlikely to occur.

A second expert for Christina, Brian Madden, also testified that after reading Riddle's report, he had never seen "a business evaluation report treat an unfunded union pension liability in the manner that it was treated in the [Riddle] report . . . ." Tr. pp. 964-65. He also testified that any potential MPPAA liability should not be shown as an actual liability for CCI that existed in 2009. Madden also discussed the fact that an "unfunded" pension liability is different than an MPPAA withdrawal liability, although the amount of a withdrawal liability may be based in part on the amount of any unfunded pension liability. Madden did concede that the potential for MPPAA withdrawal liability could play into any negotiations for the sale of a company, but in the sense that "you would have that as part of your sales agreement that if the liability agreement did fall back to you, you would have recourse to get recouped from the sale . . . ." <u>Id.</u> at 972.

In sum, two expert witnesses testified that it would be inappropriate to include the over $4.5 million in unfunded pension liability listed in Riddle's report—which actually reflects a potential MPPAA withdrawal liability—in any valuation of CCI as of 2009. The

23

trial court made detailed findings along the lines we have described as to why it rejected Riddle's report and accepted the opinions of Sponsel and Madden. There is evidence to support the exclusion of this alleged "unfunded" pension liability from CCI's valuation. For us to reach a different conclusion would require us to reweigh the evidence and judge witness credibility, which we cannot do.

### B. Equipment and Machinery

Jeff also contends the trial court erred in placing a value of $11 million on CCI's in-stock heavy equipment and machinery when valuing CCI as a whole. Again, Jeff's two appraisers valued the inventory at either $9,559,575 or $10.2 million, while Christina's valued it at $20.1 million. Jeff essentially contends that because none of the three expert appraisals came up with a value of $11 million for the equipment and machinery, the trial court erroneously picked a number out of thin air that is not supported by any evidence. We disagree with that assertion.

As a general rule, a trial court does not abuse its discretion in valuing property in a dissolution so long as its chosen valuation is within the range of values supported by the evidence. Balicki, 837 N.E.2d at 536. However, especially when a party has requested special findings and conclusions, the trial court does not have "unfettered discretion to choose any number out of thin air so long as it falls somewhere within a wide range of values supported by the evidence." Trabucco v. Trabucco, 944 N.E.2d 544, 563 (Ind. Ct. App. 2011), trans. denied. In Trabucco, we remanded for the trial court to explain how it arrived at a very precise valuation of $17,311.95 for a coin collection when no one testified

24

that it was worth that amount and the trial court's findings, as requested by the husband, failed to explain how it arrived at that amount.

Here, we conclude the trial court's findings are adequate to explain how it arrived at the $11 million figure. The trial court noted with respect to the three different valuations of the equipment, "Each of the reports presented by the parties has its flaws." App. p. 42. In particular, the trial court found that the appraisers retained by Jeff had correctly used auction sale value as the appropriate method for valuing the equipment and rejected the "desk top" method used by Christina's appraiser. However, the trial court also found that Jeff's appraisers had failed to value all of the equipment that CCI actually owned in 2009, which the trial court concluded was the relevant date for valuing CCI; Jeff does not dispute this finding or the choosing of 2009 as the proper valuation date. Because of this discrepancy, the trial court valued the equipment at $11 million in 2009, taking into account the equipment not counted by Jeff's appraisers but at an amount more reflective of auction value, not "desk top" value. Although not expressly noted by the trial court in its findings, the value of the "extra" equipment as contained in Christina's appraisal was $1.9 million. The trial court instead valued the "extra" equipment at between $800,000 and $1.4 million, depending on which of Jeff's appraisals is considered. Thus, the trial court accounted for the "extra" equipment but at a much lesser value than was reflected in Christina's appraisal. We cannot say the trial court abused its discretion in valuing the equipment as of 2009, or that its findings on the issue are insufficient to support that valuation.

### IV. Valuation of North Park and Logan

25

We now turn to whether the trial court properly valued Jeff's interests in North Park and Logan. Specifically, Jeff challenges the trial court's valuation of the land in North Park PUD as a whole, the ownership of which was divided between North Park and Logan. He also challenges the trial court's inclusion of the book value of the BANs in 2009 as an asset in North Park's valuation.

### A. Land

Regarding the value of the North Park PUD land, experts for Christina and Jeff presented widely divergent estimates of its value. Christina's expert, Wayne Johnson, has thirty years of experience in appraising real estate in the Bloomington area, particularly commercial property. He noted that Bloomington's economy is highly stable and somewhat insulated from economic downturns because of the presence of Indiana University. Johnson attempted to obtain estimates from Steve Crider regarding estimated costs of completing improvements to the real estate to comply with the PUD requirements and so forth, but Steve failed to provide such estimates. Johnson, therefore, made an "educated guess" as to such costs, estimating them to be $2.5 million. Tr. p. 348. Johnson also considered the 2006 sale of land to Bloomington Hospital within the North Park PUD at a cost of $150,000 per acre, and also reviewed comparable sales in the Bloomington area. Johnson also noted the issuance of TIF bonds by Monroe County to attempt to spur development in the PUD. Ultimately, after applying a discount, in part to account for the costs of improving the real estate in accordance with the PUD requirements, Johnson estimated that the land was worth $33,113 per acre in 2009, or a total of $9,650,000. The

26

non-discounted value of the property was $24,343,000. Johnson's valuation was based on the highest and best use of the land as development property.

Jeff's expert, Leo Lichtenberg, testified regarding real estate difficulties that were prevalent in 2009 and that many properties at that time similar to the North Park PUD were being abandoned to lenders because of their poor economic prospects. He also indicated that development in the PUD had been very slow-going, and that the current Bloomington mayoral administration was not supportive of further development there. Jeff also asserts that Johnson grossly underestimated cost of work related to complying with the PUD, directing us to testimony from Steve that it would cost three to four times the amount Johnson had said it would cost.[4] Lichtenberg valued the entire North Park PUD at $1,820,000. This valuation was based on holding the land for speculation and not immediate development.

The Indiana Tax Court, which frequently is faced with competing real property valuations in tax appeals, has observed, "The valuation of property is the formulation of an opinion; it is not an exact science." Stinson v. Trimas Fasteners, Inc., 923 N.E.2d 496, 502 (Ind. Tax 2010). This case highlights just how inexact property valuation is; the trial court was faced with two qualified experts who presented diametrically opposed opinions, supported by extensive reports and reasoning, as to the value of the North Park PUD real estate. It was for the trial court to decide which opinion to accept. We cannot reweigh the evidence or "judge the credibility of the battling expert witnesses." Goodwine v.

---

[4] Given this testimony, it is unclear why Steve was unable or unwilling to provide Johnson with any kind of estimated development costs when he had previously asked for them.

27

Goodwine, 819 N.E.2d 824, 830 (Ind. Ct. App. 2004). The trial court did not err in choosing to rely upon Johnson's valuation over Lichtenberg's.

### B. BANs/TIF Bonds

Next, we address the trial court's inclusion of $5,759,522 in the total valuation of North Park, representing the amount of Monroe County BANs held by the company at that time. Localities, such as Monroe County,[5] may issue BANs in anticipation of the issuance of long-term financing, such as TIF bonds, at a future date; BANs must mature no later than five years after their issuance. Ind. Code § 5-1.5-8-6.1. BANs, therefore, act as a kind of short-term financing for localities to "kick-start[] funding efforts for new projects." http://www.investopedia.com/terms/b/bondanticipationnote.asp. Precisely how North Park came into possession of the BANs here is convoluted and not entirely clear. Apparently, the BANs originally were purchased by CCI from Monroe County in 2005 for a principal amount of $5,759,522, plus interest, with bank funding and a guaranty from CCI, Steve, and/or Jeff. The BANs were issued in conjunction with North Park PUD's designation as a TIF redevelopment district, with TIF bonds to be issued thereupon in 2010. Subsequently, CCI paid the bank loan and the BANs were transferred to North Park by 2009. The BANs were listed on North Park's 2009 financial statements as an asset with a book value of $5,759,522 with no offsetting debt.

In October 2010, Monroe County issued TIF bonds to replace the BANs, with a principal value of $7 million, an interest rate of five percent, and a maturity date of

---

[5] The actions taken with respect to the BANs and TIF bonds actually were carried out by the Monroe County Redevelopment Commission. We will refer generically to Monroe County in this opinion.

February 1, 2021. TIF bonds are used by municipalities to finance redevelopment projects. See Note, <u>Brother Can You Spare a Dime:  Tax Increment Financing in Indiana</u>, 71 Ind. L. J. 457, 458 (1996).  They are repaid only through taxes based on the increased assessed value of real property caused by the redevelopment; "ordinary" property tax revenues, based on the original assessed value of the property as of the date a TIF district is created, cannot be used to repay TIF bonds and must go to the municipality's general fund.  <u>Id.</u>  If insufficient increases in real estate values occur within a TIF district, TIF bonds may end up going unpaid.  <u>Id.</u>

Before Monroe County issued the TIF bonds in 2010, its financial advisor, Gregory Guerretaz, strongly advised it not to guarantee repayment of the bonds through its full faith and credit and general taxing power.  He based this advice on the slow development of the North Park PUD since its creation as a TIF district in 2003, and that the total assessed valuation of the land therein was far below original projections.  Monroe County accepted Guerretaz's advice and did not guarantee repayment of the TIF bonds.  Monroe County did issue the TIF bonds, and North Park (through Steve Crider) accepted them.  Guerretaz described the decision to issue the TIF bonds and limit their repayment time to February 2021 as "a negotiated settlement" between Monroe County and North Park, to place a definitive timeline for the land to be developed.  Guerretaz deposition, pp. 63-64.  Monroe County also made $428,129 in TIF payments to North Park between October 2010 and January 2012.

Jeff contends it was error for the trial court to rely upon the book value of the BANs as listed in North Park's 2009 financial statements, which essentially represented the

original principal purchase price of the notes. He argues that the fair market value of the BANs in 2009 was considerably less than their book value, given Guerretaz's testimony, the slow development in the North Park PUD, and the potential that Monroe County may end up not repaying the TIF bonds. Regardless, it was Sponsel's opinion that it was proper to include the 2009 book value of the BANs in North Park's valuation, given its inclusion in the company's financial statements. Sponsel also stated his opinion that if Monroe County ended up not fully repaying the TIF bonds, it would be a loss reflected on North Park's 2021 financial statements, not its 2009 financial statements. Additionally, as the trial court noted, such statements were used to represent North Park's finances to banks and bonding companies. It seems disingenuous for Jeff to now claim that such statements were not an accurate representation of North Park's financial worth.

Furthermore, evidence related to the BANs' valuation—i.e., whether the North Park PUD will develop and therefore whether the TIF bonds will be repaid—is tied in directly with the valuation of North Park PUD itself. Johnson saw significant development potential in North Park as of 2009, while Lichtenberg did not, as reflected in their widely divergent appraisals. Accepting Johnson's opinion over Lichtenberg's also means there is a greater chance that the TIF bonds will in fact be repaid.

In any event, to the extent Jeff seems to suggest the trial court was required to determine the fair market value of the BANs in 2009 as opposed to their book value or original purchase price, we disagree. Where one expert relies upon fair market value in valuing a marital asset and another relies upon a different valuation method, the trial court is vested with discretion in choosing which methodology to use and is not required to use

30

fair market value.  Harvey v. Harvey, 695 N.E.2d 162, 167 (Ind. Ct. App. 1998).  We are faced with widely divergent professional opinions on how to value the BANs as of 2009.  We cannot say the trial court abused its discretion in accepting Sponsel's treatment of those notes.

### V.  Loans from Jeff's Father

Jeff next argues that the trial court erred in not including several purported loans made to Jeff by his father, Robert, as liabilities reducing the total amount of the marital estate.  Before addressing those loans, we also note that Jeff contends the trial court erred in not including a loan Jeff purportedly made to CCI as an asset within the marital estate.  In particular, in October 2007, Jeff and CCI executed a promissory note evidencing a purported loan from Jeff to CCI in the principal amount of $2,107,412.  In October 2008, this note was rewritten to reflect an outstanding debt of $1,649,994.48, although CCI had not, and never has, made any payments to Jeff on the loan.

Marital property includes both assets and liabilities.  Birkhimer v. Birkhimer, 981 N.E.2d 111, 120 (Ind. Ct. App. 2012).  We observe that, even if a trial court errs in excluding an asset from the marital estate, we may find such error to be harmless.  Helm v. Helm, 873 N.E.2d 83, 89 (Ind. Ct. App. 2007).  An error is harmless "where its probable impact, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties."  Ind. Appellate Rule 66(A).  We have difficulty ascertaining how exclusion of this purported asset affected Jeff's substantial rights.  On appeal, he is arguing several reasons why he claims the trial court over-valued the marital estate, resulting in a large equalization payment to Christina.  If this purported loan from

31

Jeff to CCI were to be included in the marital estate as an asset, it would increase the amount of that payment by over $800,000. If anything, exclusion of this purported asset would be harmful to Christina, but she makes no argument that it was erroneously excluded. Instead, she notes that inclusion of this purported asset would largely cancel out inclusion of the purported debts to Robert that Jeff claims were erroneously excluded. We decline to address the trial court's exclusion of this purported asset on the merits, given that Jeff has failed to explain how he was prejudiced by this ruling.[6]

As for loans Robert purportedly made to Jeff, the essence of Jeff's argument is that because the loans were evidenced by promissory notes, the trial court was required to include them in the marital estate as liabilities. Prior cases have clearly held, however, that courts are not required to accept one party's characterization of funds received from a third party as a debt as opposed to an outright gift. See Macher v. Macher, 746 N.E.2d 120, 124 (Ind. Ct. App. 2001) (holding that funds advanced by husband's parents as down payment for purchase of marital residence was a gift and not a loan, where there was no promissory note or other documentation, no payments were made to parents for several years, and no payments were requested). When deciding whether the exchange of money is either a gift or a loan, courts will consider factors such as an expectation or agreement regarding repayment or the accrual and payment of interest. Grose v. Bow Lanes, Inc., 661 N.E.2d 1220, 1225 (Ind. Ct. App. 1996).

---

[6] There also is some robbing Peter to pay Paul here, as a loan from Jeff to CCI would seem to be an outstanding liability of CCI that would affect its net worth and, therefore, Jeff's total net worth as a CCI shareholder.

It is true that the purported loan in <u>Macher</u> was not evidenced by a promissory note, whereas the purported loans from Robert to Jeff were, along with repayment and interest terms. Still, "The mere fact that an instrument is in the form of a loan is not necessarily conclusive, and the court, not being governed by the form of an instrument, will inquire into the facts to see what has been intended . . . ." 38A C.J.S. Gifts, § 7 (2014). In <u>Walter v. Balogh</u>, 619 N.E.2d 566 (Ind. 1993), our supreme court disregarded mortgages purporting to require payments for the transfer of land, where the evidence was clear that the prior owner of the land intended to gift it to the transferees and to forgive any payment obligations under the mortgages. The court observed that the mortgages had been drafted to allow the donor to "minimize her gift tax liabilities." <u>Walter</u>, 619 N.E.2d at 568. It then held that "'equity looks to the substance and not the form,'" and that "the technical form used to accomplish the inheritance tax purposes should not be used to defeat the express desire of [the transferor], which in fact was the substance of the entire transaction." <u>Id.</u> (quoting <u>Mishawaka St. Joseph Loan & Trust Co. v. Neu</u>, 209 Ind. 433, 450, 196 N.E. 85, 92 (1935)).

Here, Robert purportedly loaned Jeff $415,000 in 2001, $608,040.27 in October 2007, and $1,026,614.79 in December 2007. Jeff never made any payments on any of these purported loans, despite the due dates as indicated in all three promissory notes having passed. There is no evidence that Robert ever requested any payments. Additionally, as supported by testimony from witnesses for Jeff, he admits in his brief that these purported loans "were an estate planning device to transfer ownership of the Crider Entities at [Robert's] death at a pre-determined price" and part of an overall plan to reduce

33

the size of Robert's estate. Appellant's Br. p. 39. If these purported loans were intended to reduce the size of Robert's estate-to-be, a reasonable corollary to such an admission is that the purported loans are not assets of Robert's—that he simply intended to give this money away to Jeff with no expectation of repayment. And a reasonable corollary to that conclusion is that the purported loans are not liabilities of Jeff's. Also, with respect to the 2007 notes, the trial court found them to be consistent with other financial dealings that may have been calculated to reduce Jeff's apparent net worth and income in the final years of the marriage after Christina's first attempts to end it, such as CCI's drastically reduced distributions to shareholders and Jeff's failure to provide personal financial statements to lending institutions after 2007.

We also conclude it was not inconsistent for the trial court to include the $530,000 loan from Jeff to Robert for Robert's purchase of Jeff's interest in HIS Constructors as a marital asset while excluding the purported loans from Robert to Jeff as marital liabilities. Jeff agreed to inclusion of this loan as a marital asset, he expected Robert to repay it, Robert had in fact paid $50,000 towards it, and Robert later received $1.2 million for selling the HIS Constructors interest he received from Jeff, which could be used for repaying the loan from Jeff. Quintessentially, it was a factual matter for the trial court to decide the actual intent of Jeff and Robert with respect to the various loans they exchanged amongst themselves. We cannot say it abused its discretion in excluding the three purported loans from Robert to Jeff as actual marital liabilities while including the loan from Jeff to Robert as a marital asset.

### VI. Child Support Obligation

34

In his first appeal, Jeff challenged the trial court's decision to delay for ninety days the effective date of the reduction in his child support obligation from the provisional amount of $1,257.13 per week to the post-dissolution amount of $308 per week. After the first appeal was initiated, the trial court modified the child support order so that Jeff would have to continue paying the $1,257 per week in support indefinitely, in light of his failure to pay the equalization judgment to Christina; Jeff challenges this modification in his second appeal. A trial court's child support calculation is presumptively valid. Ashworth v. Ehrgott, 982 N.E.2d 366, 372 (Ind. Ct. App. 2013). We will reverse a child support calculation only when it constitutes an abuse of discretion. Id.

Neither party cites, nor have we discovered, any case in which a trial court delayed the effective date of a final post-dissolution child support order to a future date. Jeff characterizes this delay as a "deviation" from a support order required by the Indiana Child Support Guidelines after consideration of the parties' respective incomes. Strict application of the Guidelines creates a rebuttable presumption that it reflects the correct amount of child support to be awarded. Saalfrank v. Saalfrank, 899 N.E.2d 671, 676 (Ind. Ct. App. 2008) (citing. Ind. Child Supp. Guideline 2). If strict application of the Guidelines would be unreasonable, unjust, or inappropriate, a trial court may deviate from them if it enters written findings articulating the factual basis for the deviation. Id. (citing. Ind. C.S.G. 3). Jeff claims the trial court did not enter written findings explaining this supposed deviation from the Guidelines.

To the extent this could be characterized as a deviation, we disagree with Jeff. To the contrary, the trial court's findings as a whole clearly reveal that it was delaying

35

implementation of the reduced child support obligation because the substantial reduction in Jeff's income upon which it was based—from over $900,000 to approximately $200,000 per year—would only come about through his liquidation of some of his income-producing business assets in order to pay the equalization judgment to Christina. The trial court originally granted Jeff ninety days to accomplish this payment, as reflected in its ninety-day delay in the accrual of post-judgment interest. The trial court thus indicated that it would be advisable for Christina to continue receiving the higher child support amount for a set period of time after the divorce was final.

Jeff also contends that the trial court's rationale for delaying the child support reduction is inconsistent with its decision to impute weekly income of only $481 to Christina. This was the same amount of income imputed to Christina in the provisional child support order, and the trial court found it had "not been presented with compelling evidence to amend its prior determination." App. p. 53. However, as noted by Jeff, payment of the equalization judgment will result in Christina having a sizable amount of cash at her disposal, which he claims she could invest and receive substantial investment income on and, therefore, the trial court should have imputed such income to Christina.

Christina does not respond to this argument. An appellee's failure to respond to an appellant's argument is akin to not filing a brief as to that issue. Khaja v. Khan, 902 N.E.2d 857, 868 (Ind. Ct. App. 2009). This failure permits us to reverse if Jeff has demonstrated prima facie error, which is error at first sight, on first appearance, or on the face of it. See id. However, we are not relieved of our obligation to correctly apply the law to the facts in the record to determine whether reversal is required. Id.

36

We conclude that Jeff has demonstrated prima facie error on this issue, to an extent. Included within the definition of "Weekly Gross Income" under the Child Support Guidelines are "dividends . . . interest, [and] capital gains . . . ." Ind. C.S.G. 3(A). In Gardner v. Yrttima, 743 N.E.2d 353, 358 (Ind. Ct. App. 2001), we held that when one parent receives a lump-sum inheritance, interest, dividends, or other income generated from investing that sum should be included in gross income for purposes of determining child support. Alternatively, if a parent decides not to invest such a sum in income-producing assets, a trial court may decide to impute income to the parent, depending on the facts and circumstances. Id. Here, it is unclear why it would be inappropriate to expect Christina to invest at least a portion of the judgment she receives from Jeff in income-producing assets. On the other hand, of course, Jeff has yet to pay that judgment. At present, it would be inequitable to impute income to Christina based on investment of money that Jeff has failed to pay her. We hold, however, that upon finalization of this appeal and payment of that judgment, the trial court should undertake to recalculate Christina's weekly gross income to reflect the realistic investment income potential of receiving over $4.7 million, and to recalculate Jeff's child support obligation accordingly.

Finally, we address the trial court's granting of Christina's motion to modify the original dissolution decree so as to remove the ninety-day delay in the child support reduction and, instead, indefinitely leaving in place the much-higher provisional child support order. Although raised by neither party, we are compelled to address sua sponte whether the trial court had jurisdiction to enter that order. See Jernigan v. State, 894 N.E.2d 1044, 1046 (Ind. Ct. App. 2008). Under Indiana Appellate Rule 8, when a party initiates

37

an appeal from a trial court order, this court "acquires jurisdiction on the date the Notice of Completion of Clerk's Record is noted in the Chronological Case Summary." Orders issued by a trial court after this date generally are void. Id. "The policy underlying the rule is to facilitate the efficient presentation and disposition of the appeal and to prevent the simultaneous review of a judgment by both a trial and appellate court." Id. There are exceptions to this rule, such as to allow a trial court "'to reassess costs, correct the record, enforce a judgment, continue with a trial during an interlocutory appeal concerning venue, or preside over matters which are independent of and do not interfere with the subject matter of the appeal.'" Id. (quoting Clark v. State, 727 N.E.2d 18, 21 (Ind. Ct. App. 2000), trans. denied); see also In re Marriage of Bartley, 712 N.E.2d 537, 547 (Ind. Ct. App. 1999) (holding trial court order, which purportedly "corrected" divorce decree to alter marital property division, was void because it was entered after this court obtained jurisdiction).

Here, the Notice of Completion of the Clerk's Record was noted in the CCS on July 29, 2013. Christina filed her motion to modify on August 30, 2013, and did not file a timely motion to correct error. The order modifying the dissolution decree regarding child support was entered on December 23, 2013. This was not merely a matter of correction of a scrivener's error, nor was it independent of the matters presented in the first appeal. As we have now addressed, child support was one of the issues raised in that appeal; also, the arguments regarding the valuation of the marital estate and the equalization judgment are integrally related to the child support issue because resolution of those issues impact Jeff's ability to pay child support. Furthermore, indefinitely extending the ninety-day deadline for the child support reduction was not merely a matter of enforcing the dissolution decree.

38

As noted, the decree in other respects had self-executing mechanisms surrounding payment of the equalization judgment. For example, post-judgment interest on the equalization judgment was excused for the first ninety days, but would automatically accrue thereafter if Jeff had not paid it by then. The child support order, by contrast, contained no language stating that it would not be reduced if Jeff failed to timely pay the equalization judgment. Instead, the trial court materially altered the original dissolution decree after it had lost jurisdiction to do so. Thus, that alteration was void, and it is of no effect. Jeff's current support obligation is $308 per week, as of ninety days after the dissolution decree was entered.[7]

## VII. Ownership and Control of CCI and other Crider Entities

Next, we address the complex and sensitive issue of the trial court's use of security liens against Jeff's various interests in the Crider Entities as a means of enforcing the equalization judgment. We note that this issue, as well as the next three issues, touch at least in part upon matters occurring after the first appeal was initiated and the Clerk's Record was completed. However, unlike with the child support issue, those matters are

---

[7] We are cognizant that our refusal to consider this issue now could lead to more litigation in the future, given the litigiousness of these parties, but this does not permit us to ignore jurisdictional rules. See In re Guardianship of Hickman, 811 N.E.2d 843, 850 (Ind. Ct. App. 2004), trans. denied. We further note that even if the trial court revisits the question of modifying Jeff's child support obligation upon termination of this appeal, such modification could only be made effective upon the date the trial court reobtains jurisdiction following certification of this appeal as final. See Harris v. Harris, 800 N.E.2d 930, 937 (Ind. Ct. App. 2003) (holding trial court was permitted to rule on child support modification request filed before appeal was certified as final, but that effective date of modification could be no earlier than when Indiana Supreme Court denied transfer on appeal and trial court reobtained jurisdiction), trans. denied.

directly related to collection and enforcement of the equalization judgment. Thus, the trial court had jurisdiction to address those matters. See Jernigan, 894 N.E.2d at 1046.

As a preliminary issue, the Crider Entities claim they were deprived of due process because they were not served with notice of the divorce proceedings before the trial court impacted their businesses by granting Christina a security interest in Jeff's interests therein in the dissolution decree.[8] We find nothing improper here. Typically, the only proper parties to a marital dissolution proceeding are the spouses. State ex rel. Stanton v. Superior Court of Lake County, 265 Ind. 414, 416, 355 N.E.2d 406, 407 (1976); Gaw v. Gaw, 822 N.E.2d 188, 191 (Ind. Ct. App. 2005). If Jeff, as responding party (and shareholder or member of the Crider Entities), believed that the Crider Entities needed to be joined in the proceeding as indispensable parties under Indiana Trial Rule 19, it was incumbent upon Jeff to file a motion requesting joinder. See Dunson v. Dunson, 769 N.E.2d 1120, 1126 (Ind. 2002) (holding father waived claim that alleged de facto custodian should have been named as party in child support proceeding by failing to move to join party or to dismiss for lack of an indispensable party). And, the Crider Entities cite no authority for the proposition that the mere creation of a security interest against a business partner's interest in the business impacts a property interest owned by the business and the other owners that requires due process protections. See Bankhead v. Walker, 846 N.E.2d 1048,

---

[8] Despite the Crider Entities not being named in the divorce proceedings and not receiving "official" notice of them, the businesses were represented by counsel who participated in those proceedings and the dissolution hearings. A party not officially served with process for a proceeding may waive claims related to the failure of service where the party participates in the proceeding, such as by objecting to testimony, inspecting evidence, cross-examining witnesses, and making oral argument. See Anderson Fed. Sav. & Loan Ass'n v. Guardianship of Davidson, 173 Ind. App. 549, 553, 364 N.E.2d 781, 784 (1977).

1053 (Ind. Ct. App. 2008) (noting that procedural due process protections apply only to deprivations of life, liberty, or property). That is all that the original dissolution decree here did—it granted Christina a security interest against Jeff's ownership interests in the Crider Entities. We acknowledge and agree that the Crider Entities were entitled to notice and an opportunity to be heard with respect to any enforcement or foreclosure of Christina's security interests. See Brant v. Krilich, 835 N.E.2d 582, 588 (Ind. Ct. App. 2005) (holding LLCs were entitled to notice of proceedings supplemental instituted by a judgment creditor to attempt to obtain judgment debtor's interests in the companies to pay judgment debt). The Crider Entities did successfully intervene in the trial court proceedings below after the original dissolution decree was entered and have been participating in those post-judgment collection proceedings, as well as this appeal.

Under Indiana Code Section 31-15-7-8, a trial court entering a dissolution decree with an equalization judgment "may provide for the security, bond, or other guarantee that is satisfactory to the court to secure the division of property." It is abundantly clear that the trial court was permitted to grant Christina a security interest against Jeff's CCI stock and his membership interests in the LLCs, and that such liens could be foreclosed to pay the equalization judgment. See F.B.I. Farms, Inc. v. Moore, 798 N.E.2d 440 (Ind. 2003) (generally affirming foreclosure sale of stock in closely-held family business in order to satisfy outstanding debt on dissolution decree equalization judgment). We also reject Jeff's suggestion that the trial court's dissolution order was somehow incomplete and erroneously delegated to Christina "the power to decide when, if ever, to divide the property." See Henderson v. Henderson, 401 N.E.2d 73, 74 (Ind. Ct. App. 1980). The trial court divided

41

the marital property, not the businesses, and ordered Jeff to make an equalization payment, while providing mechanisms for Christina to enforce that judgment.

Still, Jeff and the Crider Entities contend that the dissolution decree is erroneously worded in such a way as to automatically transfer one-half of Jeff's interests in the businesses to Christina in the event he did not pay the equalization judgment within 180 days. That date was December 28, 2013. We do agree that the decree contains overly-broad language with respect to Christina's security interests, and that the trial court exceeded its authority to the extent it permitted an automatic foreclosure of Christina's security interests in the event Jeff failed to pay the equalization judgment. See Moore v. Moore, 482 N.E.2d 1176, 1181 (Ind. Ct. App. 1985) (holding trial court erred in ordering that in event wife failed to pay equalization judgment to husband, court clerk could automatically enter judgment against wife and order sale of stock in closely-held family business).[9]

Ownership interests in closely-held businesses present special challenges when it comes to equitably dividing a marital estate. As a general rule, "[t]he creation of joint control or ownership of assets in divorced persons should be avoided unless there are insufficient assets to otherwise divide the property." 24 Am. Jur. 2d Divorce & Separation § 535 (2014). Additionally, "[w]here the marital property includes stock in a close

---

[9] The same spouses and the same stock were at issue in both F.B.I. Farms v. Moore and Moore v. Moore. In Moore v. Moore, this court held that the trial court was entitled to impose a lien against the stock, but that it could not authorize the court clerk to automatically sell the stock in the event of the wife's failure to pay the equalization judgment. We also held the trial court relied upon improper considerations when dividing the marital property and remanded for a new trial. That new trial evidently resulted in the husband having a lien against wife's closely-held stock in the business started by wife's father, which husband foreclosed upon and which was addressed in F.B.I. Farms v. Moore.

corporation, an award to one spouse of such stock, subject to an obligation to pay the other spouse an appropriate sum, constitutes an equitable division, serving to disengage the parties' financial affairs and to reduce the likelihood of interference with one another or with the operations of the company." Id. Courts generally recognize that the success of a closely-held business "is usually dependent upon the business skills of the principal shareholder, and that a division of the shares could effectively destroy his or her incentive or ability to operate the business, thereby jeopardizing the continued operation of the corporate business and the stockholders' interests." Borodinsky v. Borodinsky, 393 A.2d 583, 588 (N.J. Super. Ct. App. Div. 1978). Thus, continued entanglement by two spouses in a closely-held business after divorce generally should be avoided, unless it is impossible to do so because of the absence of other liquid assets in the marital estate to equitably divide the property. See Hutchins v. Hutchins, 376 A.2d 744, 746 (Vt. 1977).

Here, much of Jeff's sizable net worth was tied up in his stock and membership interests in the Crider Entities. There were not enough liquid assets to simply award Christina her fair share of the marital estate and entirely avoid some continued entanglement between Jeff and Christina in those businesses. The granting of security interests against Jeff's stock and membership interests to guarantee payment of the equalization judgment—with the implication that such interests could be foreclosed if the judgment was not paid—was appropriate. To the extent Jeff and the Crider Entities suggest that any kind of transfer of Jeff's stock and membership interests is absolutely forbidden, they practically write those stock and interests out of the marital estate. That is improper, and Jeff does not argue that the stock and membership interests are not marital property.

43

Otherwise, Jeff could perpetually refuse to pay the equalization judgment, and Christina would have very limited recourse for collecting it.

Our supreme court in F.B.I. Farms stated, very clearly, that a stock transfer restriction agreement[10] simply cannot apply to some involuntary transfers and expressly held, "In a dissolution, the interests of the spouse require permitting transfer over the stated intent of the parties." F.B.I. Farms, 798 N.E.2d at 449. Jeff and the Crider Entities have eagerly attempted to write off this statement as mere dicta, but we decline to do so. It is a central holding of the case. Moreover, it is consistent with general Indiana corporate law, namely, that a corporation's articles and bylaws, including stock transfer restriction agreements, constitute a contract between the shareholders themselves and between the corporation and the shareholders. See id. at 445. It is not a contract with the world at large. In order to be bound by such an agreement, an outside party must have notice of the restrictions. Id. at 446. See also Kelley, Glover & Vale v. Heitman, 220 Ind. 625, 635, 44 N.E.2d 981, 985 (1942) (enforcing validity of corporate note allegedly executed in violation of corporate bylaws and holding, "[p]ersons who are not members or officers of a corporation are not affected in any of their rights by corporate by-laws of which they have no notice."), cert. denied; State ex rel. Koons v. First Nat'l Bank of Jeffersonville, 89 Ind. 302, 310 (1883) (holding stock transfer restriction in corporate bylaws did not prevent levy against and sale of stock by third party in order to pay judgment). A business's internal

---

[10] Such agreements are authorized by Indiana Code Section 23-1-26-8.

44

bylaws or operating agreement cannot act as a magic shield that protects it from innocent third-party creditors.

The trial court's order, however, could have done more to avoid continued entanglement between Jeff and Christina in the family businesses. The order, while properly granting Christina security interests in Jeff's stockholdings and membership interests, also purported to automatically give Christina full "ownership and control" of one-half of those stock and interests if Jeff did not pay the equalization judgment within 180 days, without limitation, until the judgment was paid in full. This broad, undefined language regarding "ownership and control" has the potential to cause grave mischief by allowing Christina to insert herself into the management of the Crider Entities, where she never had any such role.[11] We believe there were better solutions available to the trial court than to complicate the nature of the closely-held Crider Entities in this fashion.

We first address Jeff's stock in CCI, which is governed by slightly different statutes and rules than his membership interests in the LLCs. There is one way in which the trial court could have significantly minimized the impact of granting Christina an interest in one-half of Jeff's shares in the company upon his failure to pay the judgment. Namely, Jeff owns a total of 109 shares of CCI. Of that number, seventy-nine are non-voting shares. Christina could be given an equitable interest only in 55.5 shares of Jeff's non-voting CCI stock. Thus, Christina would be entitled to receive distributions from CCI without being

---

[11] The Crider Entities assert that such mischief has already started to occur.

45

allowed to participate in management of the company.[12]   Also, to the extent such non-voting shares might be worth less than voting shares, we note that Christina is not being awarded the shares themselves, but only the distributions to which a shareholder is entitled.

Alternatively, F.B.I. Farms sets out a very clear roadmap for what to do when stock in a closely-held corporation subject to a stock transfer restriction agreement is used as security to guarantee the payment of a dissolution decree's property equalization judgment, and that payment is not made.  Any sale of such stock to satisfy a judgment must be accomplished through the well-settled procedures for execution of a lien through a sheriff's sale, which is what occurred in F.B.I. Farms.  Specifically, Indiana Code Section 34-55-3-5 governs levies upon and sheriff's sales of stock in order to satisfy a judgment.[13]   CCI would be entitled to notice of and participation in such proceedings.  Also, CCI and its shareholders would be entitled to insist upon compliance with those parts of the stock transfer restriction agreement that give first CCI, and then the shareholders if CCI declines, the right to purchase the stock before any other sale could take place.  See F.B.I. Farms,

---

[12] The Crider Entities also posit that the trial court could have created a voting trust, whereby Christina would retain the equitable benefit of distributions from CCI while a trustee retains the legal right to vote the shares.  It is not abundantly clear that a trial court may order the creation of a voting trust, which is a creature of statute in Indiana.  See Matter of Carl F. Bettner Trust, 495 N.E.2d 194, 195 (Ind. Ct. App. 1986); I.C. § 23-1-31-1.  It is unclear, for example, whom the trial court might name as the voting trustee, which ordinarily is agreed upon by the shareholders establishing a voting trust.  In any event, it seems overly-cumbersome, and more intrusive upon CCI's closely-held character, to establish a voting trust when the majority of Jeff's shares are non-voting and Christina could be given an equitable interest in those shares only.

[13] The Crider Entities assert that Christina's security interests are governed by Article 9 of the Uniform Commercial Code, found at Indiana Code Chapter 26-1-9.1, and that any foreclosure thereof must comply with that Article.  They cite no authority for the proposition that liens imposed by a court to enforce a judgment are equivalent to liens arising out of secured transactions.  We decline to hold that Article 9 controls here.

46

798 N.E.2d at 446. CCI and its stockholders could waive reliance upon their right of first refusal if they fail to insist upon its exercise. See id. at 446-47. And, if an outside third party does purchase the stock with knowledge of the stock transfer restriction agreement,[14] that third party would be bound by the agreement in the future, as well as other bylaws. See id. at 449-50. But as we and F.B.I. Farms have already made clear, the stock transfer restriction agreement does not prohibit the sale of CCI stock by a sheriff to a third party in order to satisfy Christina's equalization judgment. See id. at 449. We also observe that a sale of stock would incorporate proportionate shares of both voting and non-voting stock, to fairly compensate Christina for their total value.

Regarding Jeff's membership interests in the LLCs, the trial court's automatic granting of "ownership and control" of those interests upon Jeff's failure to pay the equalization judgment violates statutory law regarding LLCs.[15] We discussed at length the use of a judgment debtor's membership interest in an LLC to satisfy a judgment in Brant v. Krilich, 835 N.E.2d 582 (Ind. Ct. App. 2005). We observed that the statutory definition of an "interest" in an LLC "'means the member's economic rights in the limited liability company, including the member's share of the profits and losses of the limited liability

---

[14] In F.B.I. Farms, the stock was purchased by the foreclosing party, i.e. the ex-husband who was seeking satisfaction of the equalization judgment owed by his ex-wife. Christina also would have the option of purchasing the CCI shares through a sheriff's sale if CCI and its other shareholders declined their right of first refusal.

[15] There is one limited partnership at issue in this case, the Crider Family Limited Partnership. The laws governing limited liability partnerships provide similar protection to LLCs; no party indicates that there is any substantial difference in the laws governing the two types of business organizations for purposes of this case. Additionally, the value of this business attributable to Jeff—$20,840—is de minimis as compared to the $4.7 million equalization judgment.

company and the right to receive distributions from the limited liability company.'" Brant, 835 N.E.2d at 592 (quoting I.C. § 23-18-1-10). Additionally, Indiana Code Section 23-18-6-3 provides that if an interest in an LLC is assigned, the assignee is entitled to receive "only the distributions to which the assignor would be entitled," and that assignment of an interest "does not of itself dissolve the limited liability company or entitle the assignee to participate in the management and affairs of the limited liability company or to become or exercise any rights of a member . . . ."[16] Considering this statutory language, we held in Brant that "essentially a charging order is the only remedy for a judgment creditor against a member's interest in an LLC." Id. (citing I.C. § 23-18-6-7). A judgment creditor awarded a charging order under Section 23-18-6-7(b) "has only the rights of an assignee of the member's interest in the limited liability company."[17]

Here, the trial court exceeded statutory authority by purporting to grant Christina "control" of one-half of Jeff's LLC membership interests. Instead, she is required to seek and obtain a charging order against those interests; again, the LLCs are entitled to notice and opportunity to participate in any proceedings in that regard. See id. at 588. As with the CCI stock, the members of the LLCs have the option to purchase the membership interests outright themselves rather than allowing their involuntary assignment to

---

[16] Indiana Code Section 23-18-6-3 governs LLCs created on or before June 30, 1999, while Indiana Code Section 23-18-6-3.1 governs LLCs created after that date. For purposes of this case, the statutes are substantially similar.

[17] We are cognizant of the potential danger here in the management of the Crider Entities—Robert, Steve, and Jeff—deciding to make no or little distributions to Christina. One would hope such would not be the case, but that they would rather seek to make fair distributions to her, and the sooner such distributions are made in an amount sufficient to pay off the equalization judgment, the sooner she is disentangled from the Crider Entities.

Christina. The scope of any such charging order can only permit Christina to receive distributions from the LLCs; she is not allowed to participate in the management of those businesses or otherwise exercise the full rights of a member. To the extent the Crider Entities claim that some of them may be required to dissolve in the event Christina is assigned Jeff's membership interest, that is not an appropriate matter for us to consider.

In sum, the trial court was fully empowered to grant Christina a security interest in Jeff's business holdings in their various forms. But it went too far in automatically transferring "ownership and control" of those holdings to Christina in the event Jeff failed to pay the equalization judgment within 180 days; we reverse the dissolution decree to that extent. With respect to Jeff's CCI stock, we remand for the trial court to put in place one of the options we discussed. It may either grant Christina an equitable interest only in 55.5 shares of non-voting stock (one-half of Jeff's 109 total), thus entitling her to corporate distributions without any management rights. Or, it may provide for a sheriff's sale of the stock at some time, subject to CCI's and its shareholders' rights of first refusal to purchase the stock beforehand. The parties, including CCI, may wish to present their opinions to the trial court regarding their preferred option. With respect to Jeff's LLC membership interests, the trial court is entitled to grant a charging order to Christina, in proceedings in which the LLCs may participate, entitling her to distributions from those businesses without any further membership or management rights. We also emphasize, as Christina concedes on appeal, that any distributions she receives from the Crider Entities under these orders must be credited against the outstanding balance of the equalization judgment. When that judgment is satisfied, Christina's equitable ownership of the non-voting CCI

shares (if that option is chosen) should cease, along with any charging orders against the LLCs.

## VIII.  Continuing Lien

Next, we address Jeff's argument in the second appeal that the trial court erroneously ordered garnishment or attachment of future property he may receive.  At the time the garnishment and attachment orders were issued in this case, Indiana Code Section 34-55-8-7 provided in part:[18]

> (a) After a hearing of which the judgment debtor has been notified, the court may order:
>
>> (1) any property, income, or profits of the judgment debtor not exempt from execution or process, in the hands either of the judgment debtor or of any other person; or
>>
>> (2) any debt due to the judgment debtor;
>
> to be applied to the satisfaction of the judgment and forbid transfers of property and choses in action.
>
> (b) The judge may order that:
>
>> (1) the judgment or execution is a continuing lien upon the income or profits of the judgment debtor in the hands either of the judgment debtor or any other person, governmental officer, or corporation from the date the order is served upon the person, governmental officer, or corporation indebted to the judgment debtor to the extent that the lien, together with all similar liens, is permitted under IC 24-4.5-5-105; and
>>
>> (2) the court may enforce all orders and decrees in the premises, by attachment or otherwise.

---

[18] This statute has been amended effective July 1, 2014.

50

Jeff argues that, pursuant to this statute, a trial court cannot order a "continuing lien" upon future "property" a judgment debtor may receive, but can only order such a lien upon a debtor's future "income or profits." Even if we were to agree with Jeff on that point, he fails to direct us to any specific language in either the garnishment or attachment order that would apply to future "property" Jeff may receive, as opposed to "income or profits." The garnishment order refers to Jeff's future "wages, salary, commissions, etc." while the attachment order refers to "any and all amounts that would have otherwise been paid, loaned, distributed to, or otherwise due" to Jeff from the Crider Entities. Jeff fails to make a cogent argument as to how these provisions constitute a continuing lien against future "property" versus future "income or profits." Failure to make a cogent argument waives the issue for appellate review. Outboard Boating Club of Evansville, Inc. v. Indiana State Dep't of Health, 952 N.E.2d 340, 344 n.3 (Ind. Ct. App. 2011) (citing Ind. Appellate Rule 46(A)(8)(a)), trans. denied. Jeff has waived this argument, and we decline to address it further.

### IX. Attachment of Loan Proceeds

Jeff also argues that the writ of attachment erred by stating that it applied to money that the Crider Entities might loan to him in the future. He asserts that any loan proceeds he might receive are not subject to garnishment or attachment because he must pay back such funds and, therefore, such funds are the property of the lender, not him. We disagree.

Indiana's statute listing property exempt from garnishment and attachment does not include loan proceeds as being exempt. See I.C. § 34-55-10-2. In fact, there is a federal statute that expressly exempts federal student loan proceeds from garnishment and

51

attachment. See Brindle v. Arata, 940 N.E.2d 320, 322 (Ind. Ct. App. 2010) (citing 20 U.S.C. § 1095a(d)) (holding student loan proceeds did not lose exempt status after excess of proceeds after payment of tuition and fees was deposited in student's bank account). Such a statute would seem to be unnecessary if loan proceeds already were generally regarded as being exempt from garnishment and attachment. Instead, the general rule appears to be that "[a] judgment creditor may garnish loan proceeds in a judgment debtor's account." In re Southwestern Glass Co., Inc., 332 F.3d 513, 518 (8th Cir. 2003) (citing First Nat'l Bank in Dallas v. Banco Longoria, S.A., 356 S.W.2d 192, 196 (Tex. Civ. App. 1962), writ refused).

Aside from these general propositions, there is a particular reason in this case for the trial court to order attachment of future loan proceeds any of the Crider Entities might make to Jeff. The trial court took particular note in its dissolution decree of the many questionable so-called loans between CCI and Jeff, and between Robert and Jeff, believing them not to be bona fide loans and to be part of a scheme to hide Jeff's true worth and income from Christina and her attorneys. During a proceedings supplemental hearing on November 5, 2013, Jeff reasserted that he only earns $72,000 in salary from CCI. He also testified, however, that CCI had loaned him money during the past year in order to help pay personal expenses such as child support. No supporting documentation regarding such loans was introduced, and Jeff also was uncertain as to the amount he had been loaned. Jeff also could not provide clear testimony on whether CCI owed him any shareholder distributions, rather than issuing him a loan. It is somewhat confusing that CCI could loan Jeff money but could not pay off the supposed $1.6 million that Jeff had loaned CCI.

Essentially, given the history of questionable loaning of money between the Crider family and the Crider Entities and Jeff, we cannot say the trial court erred in ordering attachment of any future loan proceeds the Crider Entities might issue to Jeff.

### X. Scope of Garnishment, Attachment, and Income Withholding Orders

The final issue in Jeff's second appeal is that the garnishment, attachment, child support income withholding orders do not comply with statutory requirements regarding limitations on garnishment and priority of child support payments. Christina concedes that the orders violate those statutory requirements. Indiana Code Section 24-4.5-5-105 controls here and provided in part at the time the orders were entered:[19]

> (1) For the purposes of IC 24-4.5-5-101 through IC 24-4.5-5-108:
>
>> (a) "disposable earnings" means that part of the earnings of an individual, including wages, commissions, income, rents, or profits remaining after the deduction from those earnings of amounts required by law to be withheld;
>>
>> (b) "garnishment" means any legal or equitable proceedings through which the earnings of an individual are required to be withheld by a garnishee, by the individual debtor, or by any other person for the payment of a judgment; and
>>
>> (c) "support withholding" means that part of the earnings that are withheld from an individual for child support in accordance with the laws of this state.
>
> (2) Except as provided in subsection (8), the maximum part of the aggregate disposable earnings of an individual for any workweek which is subjected to garnishment to enforce the

---

[19] This statute has been amended effective July 1, 2014.

payment of one (1) or more judgments against him may not exceed:

> (a) twenty-five percent (25%) of his disposable earnings for that week; or

> (b) the amount by which his disposable earnings for that week exceed thirty (30) times the federal minimum hourly wage prescribed by 29 U.S.C. 206(a)(1) in effect at the time the earnings are payable;

whichever is less. In the case of earnings for a pay period other than a week, the earnings shall be computed upon a multiple of the federal minimum hourly wage equivalent to thirty (30) times the federal minimum hourly wage as prescribed in this section.

(3) The maximum part of the aggregate disposable earnings of an individual for any workweek which is subject to garnishment or support withholding to enforce any order for the support of any person shall not exceed:

> (a) where such individual is supporting his spouse or dependent child (other than a spouse or child with respect to whose support such order is used), fifty percent (50%) of such individual's disposable earnings for that week; and

> (b) where such individual is not supporting such a spouse or dependent child described in subdivision (a), sixty percent (60%) of such individual's disposable earnings for that week;

except that, with respect to the disposable earnings of any individual for any workweek, the fifty percent (50%) specified in subdivision (a) shall be deemed to be fifty-five percent (55%) and the sixty percent (60%) specified in subdivision (b) shall be deemed to be sixty-five percent (65%), if and to the extent that such earnings are subject to garnishment or support withholding to enforce a support order with respect to a period which is prior to the twelve (12) week period which ends with the beginning of such workweek.

(4) No court may make, execute, or enforce an order or process in violation of this section.

\* \* \* \* \*

(8) A support withholding order takes priority over a garnishment order irrespective of their dates of entry or activation. If a person is subject to a support withholding order and a garnishment order, the garnishment order shall be honored only to the extent that disposable earnings withheld under the support withholding order do not exceed the maximum amount subject to garnishment as computed under subsection (2).

Jeff first argues—and Christina concedes—that the attachment order in this case actually was a garnishment order controlled by this statute because it purports to require withholding of a debtor's earnings by "any legal or equitable proceedings . . . ." And, as Christina again concedes, the garnishment and attachment orders combined violate the statute, because together they purport to seize 100% of Jeff's future income and earnings in order to pay the equalization judgment. The maximum amount that may be seized in order to pay a judgment are twenty-five percent of a debtor's weekly disposable earnings, or the amount by which the debtor's disposable earnings for that week exceed thirty times the federal minimum hourly wage, whichever is less.

Additionally, although the child support income withholding order was entered after the garnishment and attachment orders, it must be given priority over those earlier orders. Finally, all three orders together cannot seize a higher percentage of Jeff's income as provided in subsection (3) of the statute, which Jeff contends is sixty percent of his disposable earnings. Thus, we remand for the trial court to enter garnishment and income withholding orders that comply with Indiana Code Section 24-4.5-5-105. Of course, Jeff's

child support income withholding order also should be modified on remand as well to reflect our holding that his current weekly child support obligation is $308, not $1,257.

## Conclusion

We cannot say the trial court erred in ordering Jeff to pay to Christina an equalization judgment of $4,752,066, plus interest accruing after ninety days, and to pay any attorney fees Christina incurs in collecting the judgment. We also find no clear error in the trial court's valuations of CCI, North Park, and Logan, and in its decisions to exclude purported loans made by Robert to Jeff from liabilities of the marital estate; to conclude otherwise would constitute reweighing the evidence. We also affirm the trial court's decision to delay reduction of Jeff's child support obligation for ninety days. However, the trial court's decision to modify the obligation after the first appeal was initiated is void, and Jeff's support obligation remains at $308 per week. We also hold that upon Jeff's payment of the equalization judgment, the trial court should recalculate Christina's income and Jeff's child support obligation accordingly. Although the trial court did not err in granting Christina security interests in Jeff's CCI stock and his LLC membership interests, we find error in its decision to automatically vest "ownership and control" in those stock and membership interests upon Jeff's failure to pay the equalization judgment within 180 days. We reverse the dissolution decree to that extent and remand for further proceedings consistent with this opinion. Finally, although the garnishment and attachment orders did not erroneously garnish or attach future-acquired property by Jeff, and it was proper to extend garnishment or attachment to future loan proceeds he may receive from the Crider

Entities, we remand for the trial court to enter amended garnishment, attachment, and child support income withholding orders that comply with Indiana Code Section 24-4.5-5-105.

Affirmed in part, reversed in part, and remanded.

BAKER, J., and CRONE, J., concur.