## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 23 2020, 9:56 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jonathan R. Deenik
Greenwood, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Justin Lee Johnson, <br> *Appellant-Respondent,* <br><br> v. <br><br> Kellecina Lynn Grabhorn, <br> *Appellee-Petitioner.* | March 23, 2020 <br><br> Court of Appeals Case No. <br> 19A-DR-1901 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Marshelle Dawkins Broadwell, Magistrate <br><br> The Honorable Burnett Caudill, Temporary Judge <br><br> The Honorable James Osborn, Judge <br><br> Trial Court Cause No. <br> 49D14-1412-DR-39155 |

**Tavitas, Judge.**

## Case Summary

[1] Justin Lee Johnson ("Father") appeals from the trial court's denial of Father's petition for modification of custody, parenting time, and child support; and the trial court's award of attorney fees. We affirm.

## Issues

[2] Father raises two issues on appeal, which we restate as follows:

    I.    Whether the trial court entered insufficient or unsupported findings of fact in denying Father's petition.

    II.    Whether the trial court erred in awarding attorney fees to Mother.

## Facts

[3] The marriage of Father and Kellecina Lynn Grabhorn ("Mother") produced one child, C.J. (the "Child"), who was born in September 2009. The marriage was dissolved, pursuant to a decree, in April 2015. Upon dissolution, the parties agreed, in relevant part, that the parties would: (1) share joint legal custody; (2) Mother would maintain primary physical custody; (3) Father would be awarded parenting time, pursuant to the Indiana Parenting Time Guidelines; and (4) Father would pay $220.00 per week in child support. On June 16, 2017, the parties filed an agreed order modifying parenting time and child support. Most notably, Father's child support obligation was reduced to $33.00 per week due to Father's job loss.

[4] Mother resides in Greenfield, Indiana, with her husband, Nathan Brkljacic ("Stepfather"); Stepfather's daughter, L.; and Mother's and Stepfather's newborn. Father resides with his girlfriend, Anita Homco, in Fort Wayne, Indiana.

[5] In September 2017, Kathryn Miller of Buckingham & Associates ("Therapist Miller") began to serve as the Child's therapist. The Child presented with "anger problems and some behavioral issues[.]" Tr. Vol. II p. 15. Allegations arose regarding the Child that prompted the involvement of the Department of Child Services ("DCS"). In all, DCS's involvement resulted from: (1) Mother's allegation of inappropriate interaction between the Child and L., stemming from the children viewing each other's genitalia; (2) Therapist Miller's response to the Child showing Therapist Miller a large bruise on his side that the Child attributed to L.; and (3) two incidents of Stepfather "spanking" the Child. Tr. Vol. II p. 44. Most relevantly, the Child reported that he feared Stepfather because, after Stepfather discovered that the Child and his step-sister, L., had viewed each other's genitalia, Stepfather verbally attacked, spanked, and allegedly threatened to kill the Child. DCS did not find credible evidence of abuse.

[6] Also, in the course of this action, the Child's school assessed the Child for attention-deficit hyperactivity disorder ("ADHD") and concluded that the Child had ADHD. Therapist Miller, however, rejected the school's determination and diagnosed the Child with post-traumatic stress disorder ("PTSD") caused by Stepfather. Mother maintained that the Child actually had

ADHD and clashed with Therapist Miller. Moreover, Therapist Miller interfered with the ability of other mental health professionals to assess or evaluate the Child.

[7] On February 16, 2018, Mother filed a petition to modify custody, child support, and determination of child support arrearages; specifically, Mother sought a revision of Father's child support obligation. On February 22, 2018, Father filed a verified petition for modification of custody, parenting time, and child support, wherein Father sought sole physical custody of the Child and modification of child support.

[8] On May 10, 2018, the trial court appointed Attorney Vanessa Lopez Aguilera to serve as the Child's guardian ad litem (the "GAL"). The trial court conducted a multi-day final hearing on the parties' respective petitions on December 5 and December 11 of 2018, and February 13 and May 8 of 2019. During the hearing, the trial court ordered the Child to undergo an independent psychiatric evaluation, which was conducted by psychologist Kevin Byrd ("Dr. Byrd").

[9] During the final hearing, the trial court heard testimony from the parties, Therapist Miller, and the GAL. The trial court also admitted into evidence Therapist Miller's notes and the reports submitted by the GAL and Dr. Byrd. Notably, Therapist Miller testified that each party has a loving relationship with the Child, but that the parties' contentious dynamic renders co-parenting difficult.

[10] Therapist Miller testified further that she found the Child was "trauma[tized]" and harbored "aggression" and "frustration" toward Stepfather. *Id*. at 35. She attributed the Child's trauma to Stepfather's actions. She concluded Stepfather is frequently angry with and rude to the Child and has to work on bonding with the Child. Therapist Miller testified that, after she reported a concern to DCS, Stepfather "called [her] office and made a threat[,]" *id*. at 26; and she subsequently refused to work with Stepfather. Therapist Miller opined that Mother justified Stepfather's negative behaviors. Furthermore, Therapist Miller acknowledged, but rejected, the Child's school's ADHD diagnosis. Both Therapist Miller and the GAL testified that Father should be awarded sole physical custody of the Child.

[11] On July 15, 2019, the trial court entered its order on the pending petitions, which contained findings of fact and conclusions thereon. The trial court granted Mother's petition to modify custody and granted Mother sole legal custody of the Child with reasonable parenting time for Father, pursuant to the Indiana Parenting Time Guidelines. The trial court revised Father's child support obligation and assessed $18,000.00 of Mother's attorney's fees to Father. Father now appeals.

## Analysis

[12] As an initial matter, we observe that Mother has not filed an appellee's brief. In such cases, we need not undertake the burden of developing an argument for Mother, and we will reverse the judgment if Father presents a case of prima

facie error, that is "at first sight, on first appearance, or on the face of it." *Trinity Homes, LLC v. Fang*, 848 N.E.2d 1065, 1068 (Ind. 2006).

[13] Father argues that, in denying his petition for modification of custody, parenting time, and child support, the trial court entered insufficient and unsupported findings. Specifically, Father challenges the findings regarding: (1) Father's presentation of his case in a manner that was repetitive, duplicative, wasted court time, and caused significant expense; (2) Therapist Miller's alleged misdiagnoses, bias, and hostility toward Mother and Stepfather; and (3) the extent of the GAL's reliance on Therapist Miller's conclusions.

[14] Our Supreme Court has expressed a "preference for granting latitude and deference to our trial judges in family law matters." *In re Guardianship of M.N.S.*, 23 N.E.3d 759, 765-66 (Ind. Ct. App. 2014). Appellate deference to the determinations of trial court judges, especially in domestic relations matters, is warranted because of their unique, direct interactions with the parties face-to-face, often over an extended period of time. *Best v. Best*, 941 N.E.2d 499, 502 (Ind. 2011). Inasmuch as trial courts are enabled to assess credibility and character through both factual testimony and intuitive discernment, trial judges are in a superior position to ascertain information and apply common sense, particularly in the determination of the best interests of the child involved. *Id.* Thus, we neither reweigh the evidence nor reassess witness credibility, and we view the evidence most favorably to the judgment. *Id.* at 502.

[15] When, as here, a trial court has entered findings of fact, we employ the following two-step standard of review: (1) whether the evidence supports the findings of fact; and (2) whether the findings of fact support the conclusions thereon. *Crider v. Crider*, 15 N.E.3d 1042, 1053 (Ind. Ct. App. 2014) (citing *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997)).

[16] We will set aside findings of fact only if they are clearly erroneous, which occurs if the record contains no facts to support a finding either directly or by inference. *Id.* We must defer to the trial court's ability to assess the credibility of witnesses and will not reweigh the evidence; and we must consider only the evidence most favorable to the judgment along with all reasonable inferences drawn in favor of the judgment. *Stone v. Stone,* 991 N.E.2d 992, 999 (Ind. Ct. App. 2013), *aff'd on r'hg,* 4 N.E.3d 666 (Ind. Ct. App. 2013). "It is not enough that the evidence might support some other conclusion, but it must positively require the conclusion contended for by appellant before there is a basis for reversal." *Crider*, 15 N.E.3d at 1053. A judgment also is clearly erroneous if it relies on an incorrect legal standard, and we do not defer to a trial court's legal conclusions. *Id*.

[17] Also, because the trial court denied Father's petition to modify custody, Father appeals from a negative judgment. On appeal from a negative judgment, we will not reverse the judgment of the trial court unless it is contrary to law. *Riggen v. Riggen*, 71 N.E.3d 420, 422 (Ind. Ct. App. 2017). The judgment is contrary to law only if the evidence leads to but one conclusion and the trial court reached the opposite conclusion. *Id.*

## I. Modification of Custody

[18]     Indiana law provides in relevant part:

> (a) The court may not modify a child custody order unless:
>
> > (1) the modification is in the best interests of the child; and
> >
> > (2) there is a substantial change in one (1) or more of the factors that the court may consider under section 8[1] . . . of this chapter.
>
> (b) In making its determination, the court shall consider the factors listed under section 8 of this chapter.

---

[1] The relevant factors listed under section 8 are:

> (1) The age and sex of the child.
> (2) The wishes of the child's parent or parents.
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
> (4) The interaction and interrelationship of the child with:
> > (A) the child's parent or parents;
> > (B) the child's sibling; and
> > (C) any other person who may significantly affect the child's best interests.
> (5) The child's adjustment to the child's:
> > (A) home;
> > (B) school; and
> > (C) community.
> (6) The mental and physical health of all individuals involved.
> (7) Evidence of a pattern of domestic or family violence by either parent.

Ind. Code § 31-17-2-8. "[A] change in circumstances must be judged in the context of the whole environment, and the effect on the child is what renders a change substantial or inconsequential." *In re Marriage of Sutton*, 16 N.E.3d 481, 485 (Ind. Ct. App. 2014).

Ind. Code § 31-17-2-21.  Under Indiana Code Section 31-17-2-21, a court may not modify a child custody order unless (1) modification is in "the best interests of the child" and (2) there is a "substantial change" in one of several factors that a court may consider in initially determining custody.  The party seeking modification of a custody order bears the burden to prove both prongs, by a preponderance of the evidence, before a court can alter an existing custody arrangement.  *See Steele-Giri v. Steele*, 51 N.E.3d 119, 124 (Ind. 2016).

[19]   Here, the trial court entered extensive findings in support of its modification of custody, child support, and parenting time.  The key findings are as follows:

> 13. On December 5, 2018, the child's therapist, Kathryn Miller ("Ms. Miller"), testified that she had diagnosed the child with Adjustment Disorder with Mixed Emotional Features, Post Traumatic Stress Disorder ("PTSD"), and Adjustment Disorder with Mixed Disturbance of Emotions and Conduct.  Ms. Miller was unable to identify the factors necessary for a PTSD diagnosis and was unable to identify the stressful event or situation that led to the PTSD condition and subsequent diagnosis.  She believed it was related to Stepfather but could not specifically identify any traumatizing event.  Ms. Miller was also unable to list the symptoms of PTSD.
>
> * * * **
>
> 15. The Court had significant concerns regarding the accuracy of Ms. Miller's determinations and her possible bias and hostility toward Mother and Stepfather.
>
> * * * * *

17. On January 21, 2019, Dr. Byrd completed his evaluation and sent it to the Parties' counsel to review. Dr. Byrd's evaluation stated in part, "There is little or no evidence that [the Child] has PTSD in relation to his experiences with Mr. Brkljacic [Stepfather] . . . . Ms. Miller diagnosed [the Child] with Adjustment Disorder with Mixed Emotional Features Posttraumatic Stress Disorder, and Adjustment Disorder with Mixed Disturbances of Emotions and Conduct. There are four problems with this diagnostic picture. One, [ ] [the Child] does not meet the criteria for PTSD. Two, the second adjustment disorder diagnosis in the list above obviates the first one (including both is redundant). Three, the diagnosis of ADHD—substantiated by two teachers and my own observations — is not included. Four, it is extremely rare to be diagnosed with an adjustment disorder as well as PTSD . . . . If [the Child] did in fact have PTSD, the addition of an adjustment disorder would likely be superfluous."

* * * * *

29. Much of the stress that strained the Parties' relationship with each other was a direct result of Ms. Miller's unusual, and heavy-handed approach of attempting to block access to [the Child] by other mental health professionals and influence their evaluations, while simultaneously engaging in a pattern of behavior that suggested her resentment of Mother questioning Ms. Miller's diagnosis of PTSD and Mother's legitimate concern that [the Child] had ADHD, both concerns of Mother proving meritorious by Dr. Byrd's evaluation.

30. [ ] Despite Mother's and [the Child]'s school's concerns that [the Child] had ADHD, Ms. Miller failed to undertake any reasonable, professionally-acceptable methods to investigate this possibility. Ms. Miller treated [the Child] for PTSD without regard to the accepted definition of PTSD according to the norms

of her own profession and without being able to articulate the basis for her diagnosis.

\* \* \* \* \*

34. The Court has concerns about the GAL's findings and recommendations based, not on the work of the GAL, but [ ] on the GAL's necessary reliance on information obtained prior to the evaluation of Dr. Byrd. Ms. Miller's misdiagnosis and [ ] opinions, which the Court finds to have been heavily biased against Mother, necessarily impacted the findings of the GAL.

Appellant's App. Vol. II pp. 17, 18, 24, 25.

[20] Additionally, the trial court found: (1) there was no credible evidence of abuse in either household; (2) an award of primary physical custody to Father was not in the Child's best interest, would not benefit the Child "educationally, psychologically or behaviorally[,]" and "would be disruptive and detrimental" to the Child, *id*. at 26; (3) the Child would lose significant contact with his half-sibling if the Child moved in with Father; (4) Mother could not exercise parenting time as readily if the Child moved in with Father; and (5) joint legal custody was "untenable" because of Father's "pattern of controlling behavior [as] to Mother[,]" the parties' acrimony, and the parties' inability to work collaboratively. *Id*. at 28.

[21] On cross-examination, counsel for Mother elicited Therapist Miller's testimony that: (1) Therapist Miller's therapy notes did not enumerate the hallmarks of PTSD; (2) Therapist Miller formed a negative impression of Stepfather and

viewed Mother as an enabler of Stepfather's aggressiveness; (3) the Child is well-aware of the parties' contentious relationship and has leveraged the tensions to "triangulate"[2] and pit the parties and Stepfather against each another; (4) Therapist Miller largely accepted the Child's claims as true; and (5) the symptoms of ADHD can mirror symptoms of PTSD.

[22] Additionally, the GAL testified, or stated in her report, that: (1) "[m]ost everything [in the GAL's] report" was based upon Therapist Miller's observations and conclusions, tr. vol. II p. 231; (2) the Child's DCS family case manager advised that the Child previously gave three different narratives regarding a single event and that the Child "is manipulating and they should watch for that," exhibits vol. I p. 85; and (3) the GAL noted inconsistencies between events, as the Child reported them, and reality.[3]

[23] In his forensic psychological evaluation of the Child, Dr. Byrd concluded: (1) "there is little doubt that [the Child] meets the criteria for ADHD"; (2) [the

---

[2] Therapist Miller admitted to discrepancies between the Child's accounts of events and the parties' accounts and admitted the Child has misrepresented events. Therapist Miller also described the Child's practice of triangulation as follows: "So triangulation is when you say something to one person and then another, and sometimes they're not the same thing, but it is often an attempt to put two people against each other." Tr. Vol. II p. 52.

[3] Throughout the pendency of this action, the Child gave varying narratives to Therapist Miller and the parties. In addition to insinuating drug use and animal abuse by Father and/or Stepfather, the Child reported to Therapist Miller being in a constant state of fear regarding Stepfather. The GAL testified that, when she visited Mother's and Stepfather's home, the Child was "happy and well adjusted[,]" "hugged [Stepfather,]" and "showed no fear[.]" Tr. Vol. II pp. 229, 242. *See* Tr. Vol. IV p. 23 (the trial court's statement that "all of the adults in the [Child's] life have witnessed [the Child] at one point or another making fantastic statements . . . the gist from all the parties is that the child has told stories that later turned out to be [ ] not true."

Child] undoubtedly has a problem being factual in his reporting of events"; (3) "[t]here is little to no evidence that [the Child] has PTSD in relation to his experiences with [Stepfather]"; and (4) "PTSD is not a viable diagnosis for [the Child] based upon the facts gathered for this assessment." Father's App. Vol. II pp. 163-64, 165.

[24] Our review of the record reveals that the trial court resolved the conflicting conclusions reported by Therapist Miller and Dr. Byrd in favor of Dr. Byrd. We do not presume, from our review of a cold record, to know better than the trial judge in this regard. *See Best*, 941 N.E.2d at 502. The foregoing evidence amply supports the trial court's findings that Therapist Miller misdiagnosed the Child; and that Therapist Miller's misdiagnoses and possible biases against Mother and Stepfather resulted in Therapist Miller's and the GAL's recommendations that Father should have primary physical custody.

[25] In arriving upon its judgment, the trial court considered Therapist Miller's testimony regarding the basis for her PTSD diagnosis; the GAL's testimony, which was based largely on Therapist Miller's observations and conclusions; and Dr. Byrd's conclusion that Therapist Miller misdiagnosed the Child. The trial court's findings are not insufficient, unsupported by the record, or clearly erroneous. Nor can we say that the evidence leads to but one conclusion and the trial court reached the opposite conclusion.

## II. Attorney Fees Award

[26] Next, Father argues that the trial court erred in awarding attorney fees to Mother. We review a trial court's decision to award attorney fees in connection with a dissolution decree for an abuse of discretion. *Ahls v. Ahls*, 52 N.E.3d 797, 802-03 (Ind. Ct. App. 2016). A trial court has broad discretion in assessing attorney fees, and we will reverse only if its decision is "clearly against the logic and effect of the facts and circumstances before it or if it misapplies the law." *Id.* at 803.

[27] In awarding attorney fees, the trial court must consider the resources of the parties, their economic condition, the ability of the parties to engage in gainful employment and to earn adequate income, and such factors that bear on the reasonableness of the award. Ind. Code § 31-15-10-1; *Benefiel v. Stalker,* 119 N.E.3d 1133, 1136 (Ind. Ct. App. 2019). Any misconduct by one party that causes the other party to directly incur additional fees may be considered. *Benefiel,* 119 N.E.3d at 1136.

[28] In ordering Father to pay $18,000.00 of Mother's $24,000.00 incurred attorney fees, the trial court found that: "this matter has proceeded in an outrageously lengthy fashion despite numerous warnings from the Court due, primarily, to Father's actions"; Father and Therapist Miller "testified multiple times unnecessarily"; and the proceedings were "remarkably drawn-out, delayed and repetitive, producing a record that is exceptionally lengthy despite the lack of complexity" of the issues. Appellant's App. Vol. II pp. 15, 32-33.

[29] Our review of the record reveals—and Father acknowledges[4]—that, throughout the multi-day final hearing, the trial court cautioned Father, with great consternation, that proffered testimony was either repetitive or irrelevant and warned the parties that the matter was unreasonably protracted. *See* Tr. Vol. II pp. 102, 108, 125, 150-51, 155,168, 182-84, 193, 195, 232, 244-45; *see also* tr. vol. III pp. 8-9, 19, 42-43, 60, 65, 70-71, 72, 76, 78, 81, 82-83, 93, 106, 109, 110, 117, 120-21, 128, 134, 140, 143, 148, 151, 155, 158-62, 168-69, 172, 185, 189, 241, 246, 248-50; *and see* tr. vol. IV pp. 2, 6, 22, 23, 28-29, 34, 69 (trial court's references to the needlessly long proceedings, repetitive and/or irrelevant testimony, and questions already asked and answered); *see also* Appellant's App. Vol. II p. 32 (trial court's finding that Father presented his case for nearly two and one-half days, while Mother did so in "a little over two hours").

[30] Given this well-documented backdrop, we cannot say that the trial court's partial award of attorney fees to Mother was clearly against the logic and effect of the circumstances before the trial court.

## Conclusion

[31] The trial court's findings of fact and conclusions thereon regarding the modification of custody are sufficient, supported by the evidence, and are not clearly erroneous. The trial court's judgment is not contrary to law. The trial

---

[4] *See* Father's Br. p. 19 ("There were multiple occasions where the trial court did indicate it had received evidence before, and so would not allow for a particular line of questioning . . . .").

court did not abuse its discretion in awarding attorney fees to Mother. We affirm.

[32] Affirmed.

Najam, J., and Vaidik, J., concur.