

# IN THE
# Court of Appeals of Indiana

Karen Guilford,

*Appellant-Respondent*

v.

Edward Guilford,

*Appellee-Petitioner*



FILED

Oct 23 2025, 8:53 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

October 23, 2025

Court of Appeals Case No.
24A-DC-1587

Appeal from the Dearborn Circuit Court

The Honorable Jerome J. Charls, Magistrate

Trial Court Cause No.
15C01-2107-DC-57

**Opinion by Judge May**
Judges Tavitas and DeBoer concur.

**May, Judge.**

Karen Guilford ("Wife") appeals the trial court's partial denial of the motion to correct error she filed after the trial court entered an order dissolving her marriage to Edward Guilford ("Husband). Wife presents eight issues for our review, which we consolidate and restate as:

1. Whether the trial court abused its discretion when it assigned values to some marital assets;

2. Whether the trial court's property division methodology was erroneous or an abuse of discretion;

3. Whether the trial court abused its discretion by imputing annual income of $60,000 to Wife;

4. Whether the trial court abused its discretion by denying spousal maintenance and awarding only partial rehabilitative maintenance; and

5. Whether the trial court abused its discretion by failing to award any attorney fees to Wife.

We affirm in part, reverse in part, and remand for the trial court to enter a new final order without hearing any more evidence or argument.

## Facts and Procedural History

The parties were married on September 5, 1987, and had six children during their 36-year marriage. During the first year of their marriage, Wife used her college degree to work at a television station in Indianapolis. After the first year of the marriage, Wife became pregnant, and she thereafter served as a stay-at-

home mother and homeschooled five of their six children. Husband pursued a dual career as a military aviator and civilian engineer, and Wife interrupted her own attempts to complete a Master's degree and chaplaincy training multiple times to support the family during Husband's deployments. Husband filed for dissolution on July 30, 2021, at which time their youngest child was fifteen years old.

[3] During the three years of dissolution proceedings, Wife obtained two different employment positions – one in human resources and the other as an events coordinator at a Catholic organization – that paid approximately $60,000 annually. However, Wife was not able to remain in either of these positions for more than a few months and, at the time of trial, she needed employment from which she could take a leave of absence during three summers to complete her unpaid chaplaincy internships. At the time of trial, Husband was about to retire from military service and return to a civilian job at Quest Defense System & Solutions, where he would earn $117,000 annually.

[4] The trial court issued its Decree of Dissolution on April 25, 2024, which dissolved the marriage of the parties after finding it "irretrievably broken[.]" (App. Vol. II at 17.) The court found the parties' youngest child, J.P., who was eighteen years old, emancipated for custody and visitation purposes. The court imputed income to Wife "at $60,000 based on the two jobs she had during the pendency of this case." (*Id*. at 18.) For the period between February 27, 2024, and May 1, 2024, when Husband was still receiving his military salary, the court determined Husband's gross income was almost $189,000 per year and

ordered Husband to pay $222.40 per week in child support. After May 1, 2024, when Husband would be retired from the military, the court determined his salary from Quest and from his military pension would be almost $150,000 per year and ordered Husband to pay $118.17 per week in child support. Husband was also ordered to provide insurance for their youngest child through his Quest employment until that child is emancipated.

[5] The parties agreed the marital residence would be sold. The trial court ordered the parties to hire a realtor to conduct the sale and to deposit the proceeds from the sale with the Court Clerk. Until the house was sold, the court gave Wife exclusive possession and ordered Husband to "pay the mortgage, real estate taxes and insurance[.]" (*Id*. at 19-20.) After the house sold, the remaining mortgage was to be paid from the gross proceeds, and then the net proceeds were to be divided equally between Husband and Wife. However, before Husband received his half of the net proceeds, the Court Clerk was to withhold $55,106 for a home equity loan that had been used to pay Husband's debts.

[6] The trial court ordered Husband to keep the parties' 1986 Mercedes and ordered Wife to keep a 2017 Mazda 3 and a Dodge Neon. The only encumbered car was the Mazda 3, and the court ordered Husband to assume and pay the loan according to its terms. The trial court ordered Husband to keep some Dogecoin from one of the parties' sons. The trial court ordered the parties to equally divide a federal tax debt from 2022, and the court ordered Husband not receive any credit or reimbursement for the $184,995.66 that he had paid to maintain both of the parties during the pendency of the

proceedings. The court found Wife had rebutted the presumption of an equal division of the marital estate and divided the property – excluding the retirement accounts – such that Wife received 72.2% of the net marital estate. Wife requested Husband be ordered to pay a portion of her attorney fees, and the trial court denied that request with findings.

The trial court entered extensive findings regarding Husband's retirement accounts. First, regarding Husband's military pension, the court noted that Husband had 41 years of service, 34 of which occurred during the marriage, and that the estimated monthly benefit was $5,419.61. Husband proposed an equal division of the pension, and that is what the court imposed. The court also ordered that Wife be listed "as the surviving spouse for all purposes permitted under this retirement interest[,]" (*id*. at 22); "that the cost of any joint and survivorship annuity be divided equally[,]" (*id*.); and that "this retirement interest be divided equally, including any cost-of-living increases offered by this pension." (*Id*.) Husband also had a retirement benefit from General Electric that was estimated to be $1,077.53 per month, and the court ordered that, whenever the benefit becomes available to Husband, it be divided equally between the parties, along with the $5,000 in a GE savings account. A third retirement account with Nine Star Retirement contained $188, and the court ordered this account paid to Wife.

The trial court also addressed Wife's requests for maintenance. The court first determined Wife was not entitled to lifetime maintenance based solely on her age being 57 years. The court did, however, determine Wife was entitled to

rehabilitative maintenance because "Wife was the linchpin to the family success" and had "interrupted her career to take care of Husband and their six children." (*Id.* at 25.) After entering extensive findings, the trial court ordered Husband to pay half of the costs of Wife's "tuition, housing, books and miscellaneous student fees . . . capped at $12,300[,]" (*id.* at 27), which was half of what Wife had reported her schooling expenses should be. The trial court did not order Husband to supplement Wife's income while she was in school.

[9] Wife filed a motion to correct error, which the trial court granted in part on June 12, 2024. The trial court made the following modifications to its original order: (1) it restored Wife's former surname of "DeWitt"; (2) it made Husband responsible for all uncovered medical and dental expenses for their youngest child; (3) it made clear that Wife was entitled to all military retirement benefits, including health and dental insurance and access to the commissary; (4) it clarified that Wife was entitled to 50% of any military annuities available to Husband; (5) it ordered Husband could not elect to change his military retirement pay in a way that would negatively impact Wife's income without indemnifying Wife therefore; (6) it ordered Husband could receive 100% of any VA disability award that he might receive; and (7) it set the effective date for division for the military and GE retirements as April 25, 2025. The trial court then explained:

> In all other respects, the motion to correct error is denied and the Decree shall remain unchanged. In reaching this decision, the Court will not comment on all of the other errors identified by [Wife]. However, the Court will note that in reviewing the issue

of maintenance, the Court reviewed the case of *Lloyd v. Lloyd*, 755 N.E. 2d[sic] 1165 (Ind. [Ct.] App. 2001)[,] which was provided by counsel. The Court also reviewed *Roetter v. Roetter*, 182 N.E. 3d[sic] 221 (Ind. 2022); and re-reviewed *Blazek v. Blazek*, 631 N.E. 2d[sic] 518 (Ind. [Ct.] App. 1994). The Court also notes that it considered its award in Paragraphs 22 and the allocation of real estate expenses in Paragraph 9 of the Decree when considering [Wife]'s needs, assets and living expenses necessary to acquire the sufficient education or training to enable her to find appropriate employment. While assets and living expenses are not statutory factors enumerated under I.C. 31-15-7-2(3), the Court is not precluded from considering same.

(*Id*. at 34-5) (italics in original).

## Discussion and Decision

[10] Wife appeals following the trial court's partial denial of her motion to correct error. We review the denial of a motion to correct error for an abuse of discretion, which occurs "when the trial court's decision is against the logic and effect of the facts and circumstances before the court or if the court has misinterpreted the law." *Ind. Bureau of Motor Vehicles v. Watson*, 70 N.E.3d 380, 384 (Ind. Ct. App. 2017) (internal citations omitted). If the motion raised questions of law, we review those issues de novo. *Id*.

[11] We also review a trial court's division of marital assets for an abuse of discretion. *Roetter v. Roetter*, 182 N.E.3d 221, 225 (Ind. 2022). "A trial court abuses its discretion if its decision stands clearly against the logic and effect of the facts or reasonable inferences, if it misinterprets the law, or if it overlooks evidence of applicable statutory factors." *Id*. "The party challenging the 'trial

court's division of marital property must overcome a strong presumption that the court considered and complied with the applicable statute.'" *Id*. (quoting *Wanner v. Hutchcroft*, 888 N.E.2d 260, 263 (Ind. Ct. App. 2008)). "[W]e focus on what the trial court did and not what it could have done." *Alifimoff v. Stuart*, 192 N.E.3d 987, 998 (Ind. Ct. App. 2022), *trans. denied*. We do not reweigh the evidence or judge the credibility of the witnesses, and we consider the evidence in the light most favorable to the trial court's decision. *Id*.

## 1. Property Values

[12] Wife challenges the trial court's treatment of Dogecoin, a Mercedes, and life insurance policies. The valuation of marital assets is also within the trial court's discretion, *id*., and we will hold the trial court has not abused its discretion "if its chosen valuation is within the range of values supported by the evidence." *Id*. at 1002.

### 1.1. Dogecoin

[13] Wife asserts: "The Court erred in failing to include as part of the marital estate the Dogecoin gift the parties [sic] son had given to each of his parents." (Appellant's Br. at 29.) However, the trial court entered explicit findings regarding the Dogecoin:

> In 2015, each parent was gifted 100,000 of "mined" coins with Doge coin [sic]. The gift was made by one of their sons. In January, 2021 their son offered to buy-out each parent. Husband agreed to "sell" 50,000 coins for the sum of $3,000.00. Wife agreed to sell all of her 100,000 coins for the sum of $6,000.00. Neither party presented any evidence of ownership such as

certificates or statements. Neither party presented any evidence of any taxation associated with the "sale." Finally, neither party presented evidence that these coins could be sold to anyone other than their son. According to Husband, this bolsters his argument that the coins were never legally transferred into the names of the parties; but rather, the son has maintained ownership and the act of buying out the parents was merely a familial obligation.

The court finds that Husband has rebutted the statutory presumption of an equal division of the remaining coins in that the coins were a gift to each parent. Husband shall keep any interest in his remaining coins free and clear of any claims or interest by Wife and without offset.

(App. Vol. II at 21.)

[14]     Yet, despite what the trial court said in that explicit finding about Husband keeping all of his remaining interest in Dogecoin, the trial court included the Dogecoin on Husband's side of the balance sheet that divided the marital property between Husband and Wife. As such, the Dogecoin was included in the marital estate and the $3,000 value assigned to the Dogecoin counted toward Husband's 28% of the estate. Thus, Wife's argument that the trial court failed to include the asset within the marital estate is erroneous. The trial court included the asset in the marital estate and assigned it a value within the evidence provided by the parties. Wife has not demonstrated an abuse of discretion in this regard.

### 1.2. Mercedes

[15] Wife argues the trial court under-valued the 1986 Mercedes by assigning a value of $1,500, and she argues the court improperly relied on excluded evidence. However, Wife's argument mischaracterizes the record. While Husband's Kelly Blue Book exhibit was excluded from evidence because it valued a 1992, rather than 1986 Mercedes, Husband's opinion testimony regarding the vehicle's condition, mileage, and value was not excluded. (*See* Tr. Vol. II at 171-72.) The trial court was presented with competing evidence: Wife's documentary evidence valuing the vehicle at $25,000, and Husband's testimony valuing it at $1,500. The court made a credibility determination in favor of Husband's testimony. The court's valuation was within the scope of the evidence and does not constitute an abuse of discretion.

### 1.3 Insurance Policies

[16] Wife alleges the trial court erroneously found there were no life insurance policies. (*See* Appellant's Br. at 29.) However, what the trial court found was: "16. Life insurance with cash value. None." (Appellant's App. Vol. II at 21) (emphasis in original).

[17] Husband testified he had two term life insurance policies in which he was the named insured – the first policy was through the Army and would expire 120 days after he retired from the Army, and the second was a $150,000 policy through USAA. Husband further testified a $150,000 policy existed for Wife through the Army and that policy would also expire 120 days after he retired, if

it did not expire automatically upon divorce. Husband testified none of the policies had cash value. Thus, the evidence in the record supports the trial court's finding that the parties owned no insurance policies with cash value.

[18] Moreover, Indiana law has long held that term insurance policies with no present cash value are "excluded from the statutory definition of property" to be divided during dissolution proceedings. *Metropolitan Life Ins. Co. v. Tallent*, 445 N.E.2d 990, 991 (Ind. 1983). This rule exists because there is no "asset" to divide if the right to the money is not vested. *Bingley v. Bingley*, 935 N.E.2d 152, 156 (Ind. 2010). As such, we cannot hold the trial court abused its discretion by not assigning a value to the policies or assigning them to one party or the other.

## 2. Property Division

[19] Wife argues that the trial court's mixed approach to property division – applying equal division to retirement accounts and marital residence, while applying a 72%/28% split to others – was legally improper. (*See* Appellant's Br. at 13.) However, we disagree.

[20] Our Indiana Supreme Court addressed an analogous issue in *Roetter*, 182 N.E.3d 221. There, a trial court set aside a wife's student loans to her, set aside to a husband the pre-marital portions of his retirement and 401k accounts, and divided the remaining marital assets between the parties by giving the wife 55% and the husband 45%. *Id*. at 224. The wife appealed and argued the one-pot theory required the trial court to include all assets in the estate to be divided. Our Supreme Court held that while the "better approach" would be to include

all assets in one divisible marital pot, trial courts have discretion to use different methodologies. *Id.* at 229. The Court explained: "So long as it expressly considers all assets and liabilities, and so long as it offers sufficient findings to rebut the presumptive equal division, a trial court need not follow a rigid, technical formula in dividing the marital estate and we will assume that it applied the law correctly." *Id.* If a trial court may set aside assets or debts to one party or another prior to dividing the remaining estate between the parties, as it did in *Roetter*, there is no reason for us to hold that a trial court cannot divide the retirement accounts equally while also dividing the remaining estate by different percentages, as the trial court did here. *See, e.g.*, *Kinder v. Kinder*, 265 N.E.3d 550, 556 (Ind. Ct. App. 2025) (holding, based on *Roetter*, that trial court did not err by deciding equitable division of assets individually because court considered all assets and included findings to explain why it divided the estate as it did).

[21] Moreover, we disagree with Wife's assertion that she received only 50% of the value of the marital residence. Wife received 72% of the total marital estate (excluding the retirement accounts). The trial court effectuated this overall division by providing the parties with various allotments of assets and debts. For Wife to have nominally received more than 50% of the value from the marital residence, while maintaining her allocation of 72% of the total estate, the trial court could have had to assign more of the marital debt to Wife, which she has not requested. As neither party challenges the trial court's 72%/28% split of the marital estate, we cannot find an abuse of discretion in its decision

to divide the specific assets and debts in the manner that it did.[1] *See Fobar v. Vonderahe*, 771 N.E.2d 57, 59 (Ind. 2002) (appellate court evaluates distribution of marital estate "as a whole, not item by item").

[22] Nor can we find an abuse of discretion in the trial court's decision to divide the retirement accounts equally. The trial court explicitly explained in its order: "The equal division of the retirement interests and the unequal division of the other assets is by design. It takes into account what the Court considers just and reasonable under all circumstances including the premarital portion of the military retirement that was included in the marital estate." (App. Vol. II at 27-8.) In a separate finding the trial court explained: "Husband has a military pension/retirement interest based on 41 years of service (34 years during the marriage or 83%). . . . Husband did not request that this retirement interest be divided pursuant to any coverture fraction. Husband proposes an equal division." (*Id*. at 21.) Because the trial court entered findings to explain why it divided the assets in the manner that it did, the trial court's division of the marital estate was within its broad discretion.[2] *See*, *e.g.*, *Roetter*, 182 N.E.3d at

---

[1] Based on this same reasoning, Wife's argument that she should not have received 50% of the federal tax liability is also moot. Wife received 72% of the marital estate, which she does not challenge as improper, and we will not find an abuse of discretion in the specifics of how the trial court accomplished the division resulting in her receiving 72%. *See Fobar v. Vonderahe*, 771 N.E.2d 57, 59 (Ind. 2002) (appellate court evaluates distribution of marital estate "as a whole, not item by item").

[2] In a separate section of her brief, Wife asserts the trial court failed to give her appropriate credit for the money the parties saved on their children's school tuition and for the wages and retirement that she lost by not working during the marriage. (*See* Appellant's Br. at 28.) It seems apparent to us, however, that the trial court attempted to account for these facts by awarding Wife 72% of the marital estate, 50% of all of Husband's retirement accounts, and rehabilitative maintenance.

229 (affirming trial court's division of marital estate even though the trial court had not used the best approach available).

## 3. Income Imputation

[23] Wife challenges the trial court's decision to impute $60,000 annual income to her for purposes of calculating child support. The Indiana Child Support Guidelines allow a trial court to impute income to a parent when calculating child support if the parent is voluntarily unemployed or underemployed. *Walters v. Walters*, 186 N.E.3d 1186, 1190 (Ind. Ct. App. 2022). The Guidelines state:

> If a court finds a parent is voluntarily unemployed or underemployed without just cause, child support shall be calculated based on a determination of potential income. A determination of potential income shall be made by determining employment potential and probable earnings level based on the obligor's employment and earnings history, occupational qualifications, educational attainment, literacy, age, health, criminal record or other employment barriers, prevailing job opportunities, and earnings levels in the community. If there is no employment and earnings history and no higher education or vocational training, the facts of the case may indicate that Weekly Gross Income be set at least at the federal minimum wage level, provided the resulting child support amount is set in such a manner that the obligor is not denied a means of self-support at a subsistence level.

Child Supp. G. 3(A)(3).

[24] "One purpose of potential income is to discourage a parent from taking a lower paying job to avoid the payment of significant support." *In re Paternity of Pickett*,

44 N.E.3d 756, 766 (Ind. Ct. App. 2015). Another purpose is to allocate parents' support obligations fairly if one parent chooses not to be employed after remarrying. *Paternity of Buehler*, 576 N.E.2d 1354, 1356 (Ind. Ct. App. 1991). However, imputation of potential income is not to be used "as a tool to promote a society where all work to their full economic potential, or make their career decisions based strictly upon the size of potential paychecks." *Id.*

[25]     Herein, Wife had been a stay-at-home mother for thirty-six years with very little employment history from which to calculate her potential income. Wife obtained her college degree during the first year of marriage and worked briefly in television journalism before the birth of the parties' first child, but Wife testified she was unable to return to that field because she did not know how to work with digital media. Wife demonstrated she could obtain positions paying approximately $60,000, but these were positions that she was unable to sustain.[3] The record contains no evidence that Wife has ever earned $60,000 in a year, which makes the trial court's imputation of that level of income clearly erroneous. *See, e.g., id.* (holding trial court erred by imputing additional income to a father that the court labeled as underemployed, when that father was

---

[3] The trial court's finding that "Wife quit two jobs in the chaplaincy field that were paying roughly $60,000.00 per year" is clearly erroneous. Wife quit her position as Director of Mission Integration because she did not like the job and she wanted to be at home with the parties' youngest son during the summer months when he was sixteen years old, but the record indicates her exit from St. Bartholomew was not by her choice. Nor does the record indicate that these positions were in chaplaincy. Both jobs were at Catholic organizations, but Wife testified she could not officially work as a chaplain until she completed her studies and unpaid internships, and Wife also referred to the Director of Mission position as a "dead end job." (Tr. Vol. III at 57.)

earning the same income that he had been earning for the prior ten years). Moreover, it is utterly incongruent to recognize that Wife needs rehabilitative maintenance, as the trial court found, because she has been out of the workforce for more than thirty-six years, while also imputing to Wife a level of annual income greater than she has ever earned in her lifetime.[4] We therefore reverse the trial court's imputation of $60,000 in income to Wife.

[26] On remand, the trial court should consider Wife's actual circumstances at the time of the final hearing: she was 57 years old, her undergraduate education was obsolete, she had been out of the workforce for thirty-six years, and – according to the trial court's own finding – she is entitled to complete the chaplaincy training that was repeatedly interrupted by Husband's deployments and his filing for divorce. The trial court should determine Wife's earning capacity based on employment opportunities that will allow her to complete her chaplaincy training. If necessary, the trial court could set her income at minimum wage, *see* Child Supp. G. 3(A)(3) (permitting court to set income at minimum wage if inadequate other data exists), but at the very least, the court must impute income that is within the scope of the evidence about Wife's history and circumstances as presented at the final hearing.

---

[4] Some of the language in the final order suggests the trial court disapproved of Wife's desire to complete an education to earn $50,000 at a job that had meaning, instead of simply accepting any $60,000-a-year job that was available. (*See* App. Vol. II at 26.) However, that is not the court's role. *See Paternity of Buehler*, 576 N.E.2d at 1356 ("It is not our function here to approve or disapprove of the lifestyle of these parties or their career choices and the means by which they choose to discharge their obligations in general.").

## 4. Rehabilitative Maintenance

Indiana's legislature has authorized trial courts to order spousal maintenance in divorce cases in three circumstances: (1) if a spouse is incapacitated, (2) if the spouse with custody of children needs assistance; and (3) if a spouse needs "educational or vocational rehabilitation." *Roetter*, 182 N.E.3d at 225; Ind. Code § 31-15-7-2. "The trial court's power to award spousal maintenance is not mandatory but is wholly within the trial court's discretion." *Lesley v. Lesley*, 6 N.E.3d 963, 968 (Ind. Ct. App. 2014). We accordingly review the trial court's decision for an abuse of discretion. *Roetter*, 182 N.E.3d at 225. Moreover, when the trial court has entered explicit findings regarding requests for maintenance, we review the court's decision for clear error. *Id*.

Wife requested rehabilitative maintenance because she had been out of the work force for thirty-six years and had been unable to complete her chaplaincy training.[5] A trial "court may find that rehabilitative maintenance . . . is necessary in an amount and for a period of time that the court considers appropriate, but not to exceed three (3) years from the date of the final decree."

---

[5] Wife also requested an award of incapacitation maintenance under Indiana Code section 31-15-7-2(1), which the trial court denied, and she argues the trial court should have found "her age as a disability[.]" (Appellant's Br. at 21.) However, Wife has not cited any legal authority that would suggest age – without any physical or mental impairment – constitutes the sort of incapacitation required for an order of maintenance under that subsection of the statute. While we do not doubt that a person might struggle to acclimate to the workforce after a thirty-six-year hiatus, we reject Wife's implication that transition difficulties are tantamount to physical or mental impairments. The trial court did not abuse its discretion in denying Wife's request. *See, e.g.*, *Alexander v. Alexander*, 980 N.E.2d 878, 881 (Ind. Ct. App. 2012) (affirming denial of incapacitation maintenance when wife, who received disability payments for limitations caused by physical injuries, was college-educated and able to perform sedentary work).

Ind. Code § 31-15-7-2(3). When deciding whether to award such maintenance, the trial court should consider:

> (A) the educational level of each spouse at the time of marriage and at the time the action is commenced;
>
> (B) whether an interruption in the education, training, or employment of a spouse who is seeking maintenance occurred during the marriage as a result of homemaking or child care responsibilities, or both;
>
> (C) the earning capacity of each spouse, including educational background, training, employment skills, work experience, and length of presence in or absence from the job market; and
>
> (D) the time and expense necessary to acquire sufficient education or training to enable the spouse who is seeking maintenance to find appropriate employment[.]

*Id*. The trial court is not required to enter a finding regarding each factor, but the trial court should consider each factor as it makes its decision. *Moore v. Moore*, 695 N.E.2d 1004, 1008 (Ind. Ct. App. 1998) (discussing prior version of statute containing same language).

[29] The trial court "agree[d]" that Wife was "entitled" to an award of rehabilitative maintenance because "Wife interrupted her career to take care of Husband and their six children. By all accounts, Wife was the linchpin to the family success." (App. Vol. II at 25.) Regarding Wife's attempts to complete training as a chaplain, the trial court found:

. . . In 2012, Wife felt a call to serve and decided upon a career in the chaplaincy field. Exhibit N (first page) outlines her educational path. Notably, she began auditing classes at Mount St. Mary's Seminary. In 2016, she began a Master of Arts in Theology program. She briefly withdrew from the program with the filing of the divorce. Then returned to the program in August, 2021. She withdrew again in December, 2022 citing the need for full time employment. From January 2023 to May 2023, she was enrolled in an on-line program. And, in August, 2023 she enrolled in the Masters of Theology Program a[t] St. Meinrad Seminary. In February, 2024, she was accepted into the Chaplaincy Professional Education Program at Jewish Hospital in Cincinnati. Her intention for future education is described in greater detail in Exhibit N. The cost of this education is set forth in Exhibit P. The cost for tuition, housing, books and student fees through 2027 is $24,509.00. In addition to this cost, Wife seeks another $200,000.00 for lost income through 2027. (Exhibit P). The Court finds the request for maintenance for educational expenses well taken and the award is addressed below.

(*Id.* at 26.) Based thereon, the trial court ordered:

Having considered all factors, the Court awards rehabilitative maintenance in the form of Husband paying one-half of the cost of tuition, housing, books and miscellaneous student fees. This award is capped at $12,300 and shall be paid when Wife incurs an expense related to tuition, housing, books or miscellaneous student fees.

(*Id.* at 27.)

[30] The trial court did not, however, order a rehabilitative maintenance award for lost income during the three years that Wife would need to finish her education

and training.  The trial court explained that it rejected her request because Wife had "quit two jobs in the chaplaincy field that were paying roughly $60,000.00 per year" and "the Court does not find it appropriate to award maintenance for lost income over three years for a career choice that would result in the same annual income that she had before entering such program."  (App. Vol. II at 26.)  As we held above, the trial court clearly erred by finding that Wife's annual income was $60,000, as Wife had never earned that level of income in any year of her life.  Moreover, as we explained thirty years ago,

> when a spouse gives up his or her educational pursuits to assume the homemaking and child rearing responsibilities incident to marriage but the marriage either in the near or far term fails, it is unjust and inequitable to leave the educationally-impaired spouse without an opportunity to achieve the job market skills he or she could have reached but for the interruption of such spouse's education.

*Blazek v. Blazek*, 631 N.E.2d 518, 521 (Ind. Ct. App. 1994).  Accordingly, after the trial court imputes to Wife a reasonable level of annual income based on the evidence presented at the prior hearing, we invite the trial court to reconsider whether an award of rehabilitative maintenance income, in addition to the award provided for actual educational expenses, might be appropriate.

## 5. Attorney Fees

Finally, Wife argues the trial court abused its discretion by failing to order Husband to pay some of her attorney fees.  "The court periodically may order a party to pay a reasonable amount for the cost to the other party of maintaining

or defending any proceeding[.]" Ind. Code § 31-15-10-1(a). To decide whether to award fees under the statute, a trial court should consider "the relative resources of the parties, their economic condition, the ability of the parties to engage in gainful employment and earn adequate income, and other factors that bear on the reasonableness of the award." *Crider v. Crider*, 15 N.E.3d 1042, 1053 (Ind. Ct. App. 2014), *trans. denied*. An award is appropriate when "one party is in a superior position to pay fees[.]" *Id.* (quoting *Troyer v. Troyer*, 987 N.E.2d 1130, 1143 (Ind. Ct. App. 2013)). We review the trial court's decision for an abuse of discretion. *Id.*

[32]    Regarding attorney fees, the trial court's order explained:

> Wife requested contribution from Husband for her attorney fees in the amount of roughly $86,000.00. Pursuant to I.C[.] 31-15-10-1, the Court has discretion to award attorney fees at any time during a dissolution proceeding. The Court having considered the size [of] the marital estate; the parties' respective incomes; the parties' respective earning capacities; and, the award herein, the Court denies the request for fees. Each party shall pay their respective attorney fees.

(App. Vol. II at 28.)

[33]    Here, again, the trial court's decision was based in part on its erroneous imputation to Wife of $60,000 per year in income. We accordingly reverse the trial court's determination that Husband should not pay any of Wife's attorney

fees,[6] and we remand for the court to reconsider this issue after the court imputes a more reasonable level of income to Wife.

## Conclusion

[34] The trial court's property division methodology was permissible under *Roetter*, and its specific asset valuations represented credibility determinations supported by competent evidence.[7] We accordingly affirm the trial court on those issues. However, the trial court erroneously imputed income to Wife at a level unsupported by the evidence and then relied on that erroneous level of income when it determined the issues of rehabilitative maintenance and attorney fees. We accordingly reverse the trial court's determinations of Wife's income, the award of rehabilitative maintenance, and the award of attorney fees, and we remand for the trial court to enter a new order on those issues without hearing any new evidence or argument from the parties. Therefore, we affirm in part, reverse in part, and remand.

[35] Affirmed in part, reversed in part, and remanded.

Tavitas, J., and DeBoer, J., concur.

---

[6] We note Wife's bill for attorney's fees is greater than 50% of the value of the total marital estate, and we are somewhat astonished that Wife's counsel provided no hourly itemization to justify charging $86,000 in fees for dissolution proceedings involving so few assets.

[7] While this appeal was pending, Wife filed a motion requesting guidance because she remains financially tangled with Husband due to the court assigning her the Mazda vehicle while assigning the loan therefor to Husband. By separate order issued today, we deny Wife's motion as moot, and we order the trial court to resolve the matter on remand.

ATTORNEY FOR APPELLANT

Elizabeth M. Dodd
Louisville, Kentucky

ATTORNEY FOR APPELLEE

Jenna Brooks Rohrig
A New Leaf Legal Services, LLC
Lawrenceburg, Indiana